IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE, TENNESSEE

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Government,             )
                                    )
vs.                                 )  Case No. 3:22-cr-118
                                    )
EDWARD KELLEY,                      )
                                    )
            Defendant.              )
                                    )
```

**SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**Wednesday, July 2, 2025**
**10:01 a.m. to 2:36 p.m.**

**APPEARANCES**:

      <u>**ON BEHALF OF THE GOVERNMENT**</u>:

      CASEY THOMAS ARROWOOD, ESQ.
      U.S. DEPARTMENT OF JUSTICE
      OFFICE OF U.S. ATTORNEY
      800 Market Street
      Suite 211
      Knoxville, TN 37902

      KYLE J. WILSON, ESQ.
      U.S. DEPARTMENT OF JUSTICE
      OFFICE OF U.S. ATTORNEY
      1110 Market Street,
      Suite 515
      Chattanooga, TN 37402

**REPORTED BY**:

Teresa S. Grandchamp, RMR, CRR
United States District Court
Eastern District of Tennessee
*courtreporter.usdc.tn@gmail.com*
(865) 244-0454

**APPEARANCES:** (Continued)

**ON BEHALF OF THE DEFENDANT:**

MARK E. BROWN, ESQ.
MENEFEE & BROWN, LLP
2633 Kingston Pike,
Suite 100
Knoxville, TN 37919

* * * * * * *

<u>**INDEX**</u>

<u>**EXHIBITS**</u>

<u>**FOR THE GOVERNMENT**</u>:

|  | <u>I.D.</u> | <u>ADMITTED</u> |
|---|---|---|
| **Exhibits 1 through 5** | 9 | |
| **Exhibits 2 through 5** | | 11 |

\* \* \* \* \* \* \*

THE COURTROOM DEPUTY: All rise.

The United States District Court for the Eastern District of Tennessee is now in session, the Honorable Thomas A. Varlan, United States District Judge, presiding.

Please come to order and be seated.

THE COURT: All right. Thank you.

Good morning, everyone. Let's call up the case, please.

THE COURTROOM DEPUTY: Criminal Action 3:22-cr-118, United States of America versus Edward Kelley.

Casey Arrowood, Mr. Kyle Wilson are here on behalf of the government.

Is the government ready to proceed?

MR. ARROWOOD: Present and ready. Good morning, Your Honor.

THE COURTROOM DEPUTY: Mr. Mark Brown is here on behalf of the defendant.

Is the defendant ready to proceed?

MR. BROWN: We are, Your Honor. Good morning.

THE COURT: All right. Thank you again.

Good morning. We're here for imposition of judgment and sentence in this case.

We'll begin with you, Mr. Kelley. On

November 20, 2024, a jury convicted you of Count I of the Indictment in this case charging you with conspiracy to murder employees of the United States in violation of 18 United States Code § 1117 and 1114.

Do you understand the offense described in Count One requires a sentence of up to life imprisonment, supervised release of up to five years, a fine of up to $250,000, and a $100 special assessment?

THE DEFENDANT:  I understand, Your Honor.

THE COURT:  All right.  Next, you were convicted of Count Two of the Indictment charging you with solicitation to commit a crime of violence in violation of 18 United States Code §§ 373 and 1114.

Do you understand the offense described in Count Two requires a sentence of up to 20 years' imprisonment, supervised release of up to three years, a fine of up to $250,000, and a $100 special assessment?

THE DEFENDANT:  I understand, Your Honor.

THE COURT:  And then finally, on November 20, 2024, you were convicted of Count III of the Indictment charging you with threatening to murder federal law enforcement officers with intent to impede, intimidate or interfere with such officers while engaged in the performance of official duties in violation of 18 United States Code §§ 115(a)(1)(B) and 115(b)(4).

Do you understand the offense described in Count Three requires a sentence of up to ten years' imprisonment, supervised release of up to three years, a fine of up to $250,000, and a $100 special assessment?

THE DEFENDANT: I understand, Your Honor.

THE COURT: All right. Thank you.

Mr. Kelley, have you received and had the opportunity to read and discuss what is the Revised Presentence Report in this case with your attorney?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And, Mr. Brown, have you received the Revised Presentence Report, which I will refer to as the Presentence Report, and reviewed it with the defendant?

MR. BROWN: I have, Your Honor.

THE COURT: And the defendant has multiple objections to the report. Let me step back and talk about how the Court anticipates proceeding today.

Both counsel -- all counsel are very versed in sentencing hearings, but others may not be. But what I would anticipate is: First -- and what I typically do at the sentencing first is to hear any evidence the parties wish to offer, if any, and that would be inclusive of victim impact statements; do that first. We would then move on to a discussion with respect to

objections to the Presentence Report.  Following that, we would proceed with discussions and arguments regarding the Section 3553 factors, and then the corollary to that would be a discussion of defendant's motions for downward departure and/or variance.

We would then proceed to defendant's allocution, if any.  And I guess finally there -- we also have defendant's motion for release pending appeal. So, that's how the Court would anticipate proceeding today.  Any comments on that from counsel?

MR. ARROWOOD:  No, Your Honor.

MR. BROWN:  No, Your Honor.

THE COURT:  All right.  I mean, sometimes the victim impact statements are perhaps in a different fashion, but they -- they somewhat address or go toward the objections; more toward the 3553 factors.  That's why I think we should just go ahead and have those at the beginning.

And I would, of course, add:  I have reviewed the submitted victim impact statements.  I have read several times all of the pleadings and submissions and exhibits submitted by the parties, but certainly will entertain additional argument today.  And then after we get through all that, we'll see where we are time-wise and go forward.

Mr. Brown.

MR. BROWN: If the Court please, I'll be able to, when we get there, short-circuit a little bit on these objections because some of them just simply don't matter and are biographical information. I've got a plan on how to deal with that. So, really, the ones that kind of affect the sentencing guidelines are really more of what we're focused on.

THE COURT: That's the ones I would anticipate we'll be focusing on.

MR. BROWN: Yeah. I didn't think that the others would be. And for the Court's -- I did sort of combine the motion for departure and variance in with the 3553; so, they sort of all go together.

THE COURT: And, again, typically we would talk about that at the same time. So --

MR. BROWN: Okay.

THE COURT: And I know some of the arguments with respect to the objections fold over into the 3553 arguments. So, I'm not going to limit counsel in that regard. That's just kind of -- just, generally speaking, kind of our footprint for today.

So, why don't we go ahead and begin. Let me start with you, Mr. Brown. Does the defendant wish to offer any evidence or testimony?

MR. BROWN: No, Your Honor. All we have today is just argument to the extent that it's needed. So --

THE COURT: All right. So, Mr. Arrowood, what about the government?

(Government's Exhibits 1 through 5 were marked for identification.)

MR. ARROWOOD: Yes, Your Honor. In connection with the filing of our sentencing memoranda, we did provide the Court with five sentencing exhibits. These were not exhibits presented during the course of the trial.

Government's Sentencing Exhibit No. 1 is the report of the examination of the defendant's laptop computer. Government's Exhibits 2, 3, 4, and 5 are all recorded calls of the defendant while he's been incarcerated post-verdict, Your Honor. Perhaps we could move those into evidence now.

Perhaps there is an objection, I suspect, perhaps, to the Government's Sentencing Exhibit No. 1, which we could take up at a later time, Your Honor.

THE COURT: So, we have the Government's Exhibits 1 through 5, and, as you stated, 2 through 5 are video recordings that occurred posttrial in this case.

MR. ARROWOOD: That's correct, Your Honor.

THE COURT: All right. And Exhibit 1 is the forensic report of defendant's laptop; correct?

MR. ARROWOOD: That's correct, Your Honor.

THE COURT: All right. So, the government moves -- they have been -- they have been previously filed in connection with the pleadings, but the government moves for Government's Exhibits 1 through 5 to be made exhibits to today's sentencing hearing.

Mr. Brown, is there any objection?

MR. BROWN: Your Honor, I reviewed all of these. I obviously have no objections to 2, 3, 4, and 5. That's fine. That can be admissible.

At this point, it's okay to use Exhibit 1. I think I would like to just preserve the right to maybe object to it later. But it's okay for identification purposes, I guess.

THE COURT: All right. We'll -- we'll admit into evidence Government's Exhibits 2, 3, 4, and 5, and we will mark for identification currently Government's Exhibit 1. And it sounds like there is no objection to it being discussed as part of particularly the objections of the Presentence Report, but, perhaps, also, the 3553 factors. So, we'll make a determination on it, actually marking it as an exhibit, later in the course of today's hearing.

(Government's Exhibits 2 through 5 were received into evidence.)

MR. ARROWOOD: Okay, Your Honor. Also in our sentencing memorandum, we do refer to several trial exhibits that are in the record in the case. I could list those out if the Court wishes to include as exhibits for this purpose, or perhaps not, Your Honor.

THE COURT: I'm not sure. I mean, I'm going to let you do what you want to do, but if they're trial exhibits, I think we can just refer to them as they're trial exhibits.

MR. ARROWOOD: Perfect, Your Honor. Thank you.

THE COURT: Thank you. So, other than that, and besides victim impact statements, no other testimony or evidence today?

MR. ARROWOOD: No, Your Honor, not at this time.

THE COURT: All right. Then let's proceed with the victim impact statements. Are there victims who wish to make statements in court today?

MR. ARROWOOD: Yes, Your Honor, there are.

THE COURT: Okay.

MR. ARROWOOD: We have two statements, or statements from two different victims, and those victims

have asked that those statements be read by someone else in the court. So, if the Court would permit, we could start there, Your Honor.

THE COURT: All right. We'll let you proceed in that regard.

MR. ARROWOOD: Okay.

THE COURT: And those who wish to actually make a statement today, I'll leave it to your and their discretion as to making it from the podium or the witness stand. So --

MR. ARROWOOD: Okay. So, Your Honor, at this time, we would ask that FBI Special Agent Emily Trevino to please read a victim impact statement from one of the other victims in this case.

THE COURT: Ms. Trevino, do you want to just come up to the podium then.

SPECIAL AGENT TREVINO: (As read on behalf of unnamed victim as follows:)

"Honorable Judge, the actions of Mr. Kelley have left a long-lasting, negative impact on my life. The feelings of fear and the profound lack of safety I felt and still feel are a direct result of the plans Mr. Kelley conspired to carry out."

"During my time with the FBI, I served in several administrative roles. I was honored to be part

of the FBI, but, I must admit, I believed that by working in an admin capacity, I would be somewhat shielded by any real danger. I certainly never imagined my administrative work with the FBI would land me in the middle of a violent plot to execute federal employees connected in any way to Mr. Kelley's original case."

I will never forget the day I received the news that I, as well as approximately 30 of my other coworkers, were named on Mr. Kelley's list as targets for execution. I remember thinking this couldn't be possible. There is no way I could be a target. I was just a support employee. I was just doing my job to help carry out the mission of the FBI to protect the American people."

"But as we learned more, I realized this nightmare was, in fact, a reality. I had recently gotten married a few months before finding out about the plot Mr. Kelley intended to carry out. Being newlyweds is supposed to be a joyous time, but now it had become overshadowed by this looming fear that Mr. Kelley could carry out his plans."

"I remember telling my husband that we needed to be on high alert, and seeing the feeling of helplessness in his eyes and fear that he wouldn't be able to protect me was heart-wrenching. After all, we

had no idea what intel Mr. Kelley had collected on us or even how many people he had potentially recruited. The only thing we knew to do was to take extreme cautions, to be intentional about not being alone in public places, to take alternate routes to and from work, to change up our routines to attempt to avoid being an easy target, and to do everything we could to minimize my online presence."

"In an effort to make it more difficult to find my information online, I changed my name on the social media platforms I was subscribed to at the time. I vividly remember people reaching out to me concerned about why I had changed my name on social media and worried that I was having marital problems. This truly grieved me because I wanted to proudly display my new last name and mark this new exciting chapter. But, instead, I felt my only choice was to shrink myself and any access anyone could have to the joys of my life online just to attempt to keep Mr. Kelley from finding out more information about me."

"After Mr. Kelley's arrest, there was a little relief" -- "there was little relief. There was still too many uncertainties. Was everyone Mr. Kelley recruited to help him carry out his plans apprehended? Could there be someone else we had not yet discovered?

Or, worse, could someone else be emboldened to finish his plans after hearing about the case on national news?"

"A few months after Mr. Kelley's arrest, I was home alone overnight as my husband had been in an accident and was hospitalized in the intensive care unit. At that time we lived in a small studio apartment where each apartment was accessible by a door code. I had gotten home after dark as I wanted to stay with my husband as long as possible before visiting hours were over. But even months later, knowing Mr. Kelley was, in fact, in jail, those fears still lingered with me. That night I thought my fears were coming true when someone attempted to enter my apartment with a door code. The absolute fear that surged through my body, the thoughts that this could possibly be someone here to finish out Mr. Kelley's plans was absolutely at the forefront of my mind. I was alone, vulnerable, and I had no way to protect myself. I frantically called the police for help, and they were so kind to comfort me and reassure me. They offered to stay in the parking lot of the complex until sunrise unless an emergency happened. They gave me assurance that I could protect myself if someone entered my home and that I had done the right thing by calling."

"While this incident turned out not to be my biggest fears becoming actualized, the point remains that the possibility was there and it was a true source of fear for me in that situation."

"Today, as I share this statement, I've chosen to do so with the understanding that someone else could stand in my place and read it on my behalf. The thought of standing up before Mr. Kelley and reading this myself seemed unwise. I would not want to take the risk of him getting to study my face. I genuinely worry that he would remember me and somehow be amused by my fear and that he might come after me when he gains the opportunity."

"And this is the lingering damage Mr. Kelley's actions have caused. By creating the list and recruiting others to help him execute his plans, Mr. Kelley has left me with feelings of uneasiness that lives at the back of my mind that one day he could still actually carry out" -- "carry this out."

"I plead with the Court to consider the full scope of the suffering Mr. Kelley's actions have caused, not only to me, but to my family and all of my coworkers and their families as well who have been impacted. His decision to target public servants, to put innocent lives in danger demands that he be held accountable. I

ask that the Court impose a sentence commensurate with the severity of his actions to ensure that no one else has to endure the fear and uncertainty that we, the victims, continue to live with. Thank you for your consideration."

MR. ARROWOOD: Your Honor, we'd ask FBI Special Agent Anthony Abbey to read another victim impact statement.

SPECIAL AGENT ABBEY: (As read on behalf of unnamed victim as follows:)

"Good morning, Your Honor. Anxiety, anger, apprehension, divorce, faith. These are just a few words that come to mind when the name Edward Kelley is mentioned."

As I read this about anxiety, anger, apprehension, divorce, and faith, please understand that these are just some of the feelings that may be used to describe Kelley's actions. I am sure these feelings are universal to some people. However, the psychological effects each person felt may be different than those about to be described."

"Edward Kelley, attaching my name to a list of people that you wanted to kill has forever changed my life. Below are just a few sentences about each that I hope you listen to."

"I'm sure you're sitting there with all this tuned out. However, I hope each word uttered here today keeps you awake every night for years to come."

Anxiety: Anxiety over the unknown; anxiety over the number of unknown questions; anxiety over unknown answers; anxiety over every person outside of my residence; anxiety for my wife; anxiety for my son; anxiety for my coworkers; anxiety on top of anxiety."

"The fear and anxiety that were caused by your actions will live with me for the rest of my life. Not only my life, but also the rest of my wife's life. Every ding from the camera now has, around my residence, set off a level of anxiety. Every ding has me evaluating if I can get a weapon to protect my family. Every single ding."

"When doing basic household chores, like mowing the yard, or simply taking the trash down to the curb, every vehicle, every person gets extra scrutiny. Is that a neighbor? Did a neighbor get a new vehicle? Why is this vehicle here? Who is this following me on my way to work? Who is this following me on my way to my son's school? Is that just another father or mother that I haven't seen before at my son's school?"

"Surely if someone has a problem with me, they would address me and not go through my son. I was

simply doing my job. We arrest the bad guys. The bad guys don't get to have the offensive in this matter. We are also" -- "there are also bills, numerous bills; money spent on therapy, family therapy, doctors' visits, home protection, trying to make life normal once again. This is just a small list of things that have changed since December 13th, 2022."

"I know that you and Austin Carter are both in jail, but what about someone else? Do your friends have a copy of the list as well? How many names do you remember? Have you been to my house? Have you followed my wife? Have you been to my son's school? Have you been to one of his sporting events? Ever felt like staying in bed all day? Have you ever been afraid to move because as soon as you do, something wrong could happen? More memories, more anxiety, more questions, more anger."

"Anger. Who do you think you are? What gives you the right to get access to put together a list such as a hit list? This isn't the Wild West. You're not some modern-day Jesse James or Billy the Kid. The United States of America is a nation of laws. You and I are not above that. We are all held accountable for our actions. You are not special."

"The anger that I felt at times is

unmeasurable.  Why?  Did you really think you'd be able to kill 36 people and get away with it?  Seriously.  Marine or no Marine, did you think that you could outsmart the entire FBI and all law enforcement everywhere?"

"You upended my entire life.  I now jump even more at the sounds in the night.  We all have decisions to make.  There are also consequences that go with those decisions.  Simply, what were you thinking?  Was this what you envisioned?  Did it ever cross your mind that what you were doing was wrong?"

"I don't like the man that I've become since your actions came to light.  I'm not a happy, go-easy, jovial person anymore.  I'm quiet.  I can sit by myself and get lost in my thoughts, and the longer that I do that, the worse the day will get.  The day will go from so-so to a bad or worse feeling."

"Sitting here in court today is reality.  This is real.  Whatever fantasy you had in your head was just a fantasy.  Nothing more; nothing less."

"Apprehension:  Apprehension of the unknown; apprehension on my career; apprehension on what to do moving forward in life.  Did I choose the wrong career?  Despite some media coverage, it's honorable to serve in the FBI.  The FBI is the most prestigious law

enforcement organization in the world. Hit lists are for the movies in Hollywood, California, not real life in East Tennessee."

"What has happened since the release of the hit list has made me question my life, my purpose, my future, the future of my wife, the future of my son. Should we move? Is it time to move to another state and start a new career? What about the extent of family that moved to East Tennessee to be near us; who pays for all of that? So many questions."

"At my age, I'm not going to just be able to pick up and start a completely new career in a totally new field. I'm at a loss on what to do moving forward. All of these things are feelings that I feel on a daily basis."

"I have so many questions, but please don't think I'm asking you for any advice. Understand that your actions have forever changed the man I was and will be. Putting a list of names together to serve as a kill list has so many profound implications on those named that it's very hard for someone else to comprehend."

"Divorce: Divorce speaks for itself. Divorce is breaking a bond, a sacred bond between two people, a man and a woman, made in front of God and witnessed by families to be one until death. I was scared for my

family to the point that I came to the decision to move out and get a condo and go deep in debt, big debt. I felt this was a way to protect everyone, my wife, my son and myself."

"I felt that I had to get away from my family in order to save them from what may happen to me. This is all because of you and your actions. Do you realize that your actions have major impacts? Your actions almost broke up a family. It almost ended a marriage of 20 years. Your actions robbed my wife of spending every day with her son to only being able to spend every other week with him. The same for me. I was only able to see my son every other week. And this went on for months and months. My son questioned if we were still a family. He still has questions to this day as to why his mommy and daddy didn't live together."

"I mentioned that you almost broke up a 20-year marriage. That is true. However, faith intervened. I mentioned that you almost broke up a 20-year marriage. But don't get confused. Although my life is back on the right track now, it took a major detour from the path it was on, both professionally and personally. That detour is why you wear handcuffs each time you enter and leave this courtroom."

"Faith: I am fortunate that through my faith

and, more importantly, my wife's unwavering faith that our marriage was saved. Through faith and numerous, numerous therapy sessions, I have been able to somewhat recover from the shock and learn to lean more into my faith in everything will be alright. I know my life will never be the same. I know the life my wife wanted will never be the same. We, my wife and I, are still working through issues that were a direct result of your actions. Please let that sink in. My family is still dealing with issues that you created."

"My faith is stronger now than it has ever been in my life. Don't get it confused. The anxiety and the anger mentioned before are debilitating at times. But with my faith, I have the ability to be here today. This is a day that I've waited on for a long time. This is just another step in a long line of steps in healing. This healing will take years or decades to completely recover from."

"My hope is that when you lay down at night, all you see are the numerous faces here behind you today. Each person here staring at the back of your head is a person whose life has been affected by your actions more than likely in a negative way."

"I hope and pray that over the years each night you are behind bars and try to go to sleep, all you see

are the same faces over and over again, the faces of the good people of the Federal Bureau of Investigation serving the American people against all terrorists, foreign and domestic."

THE COURT: Thank you.

Mr. Arrowood.

MR. ARROWOOD: Your Honor, at this time, we'll transition to victims who are here inside the courtroom.

UNIDENTIFIED SPEAKER: Your Honor, thank you for the opportunity to address you and the court. I won't take up much time.

When I was first made aware of the hit list, I was numb. Was this real? But reality quickly set in. My name was on a hit list. While I had concern for myself, my focus was on my son and his safety, and most urgently, how do I tell him about what's going on.

You see, I don't talk about work outside of work. I do talk about my friends and coworkers on a personal level, but never talk about what I do or what I work on.

Now, imagine for the first time I do talk about work to my son, I have to tell him his momma's name is on a hit list. I never want to see that look on his face again.

While we were offered accommodations elsewhere,

I felt I could better protect my son and myself at home. But things had to change immediately; from walking our dogs, to enjoying our backyard, going to the store, going to work and school, all of it had to change. Even after the arrest of Mr. Kelley and Mr. Carter, there wasn't an immediate relief. Who knew who else may have this list.

Needless to say, going to the office was the hardest for me. Who would be watching as I drove up the hill or where I parked and walked in. I would wonder, and still do, why is that car driving so slowly? Why are they parked right outside of the fence? To this day when I walk in to or out of work, I scan the fence line to see if I can see anyone.

I didn't realize the toll it had taken on my son until one day he said, "Mom, that car behind us" -- "that car has been behind us a long time," or, "Mom, could you go home a different way?" Or even sitting in the house and him say, "Why is that car stopped on the road?" To this day, if he does go anywhere with me, he won't get into the car until I get in. He scans and watches everyone around us. He shouldn't have to be pretending that he is protecting me. Since he started driving, he constantly watches his rearview mirror just like I do.

I want you to understand, we do not do things -- we don't not do things. We are just very aware of our surroundings. Mr. Kelley does not have that kind of control over either of us.

I also want to mention how it has hurt my heart to see the toll it has taken on some of my dear friends. No one should be in fear of their or their family's lives or looking over their shoulder; nor should any of them take on any blame for this. Mr. Kelley and Mr. Kelley alone is responsible for his words, both spoken and written, and his actions.

And if I may, I would like to address Mr. Kelley directly.

Mr. Kelley, I understand you to be a religious man. James tells us those who consider themselves religious and yet do not keep a tight rein on their tongue deceives themselves and their religion is worthless. Your lack of regard for human life is disgusting and your lack of remorse says everything about your heart.

Matthew 15:18 says, "But the things that come out of the mouth come from the heart and those things defile the person."

Mr. Kelley, the Lord is interested in the condition of our hearts and our intentions. He knows

your heart and he knows your intentions. Just like everyone else in this courtroom, he shed his blood for you. My prayer for you is for you to seek and know him and his mercy and grace.

THE COURT: Thank you.

MR. ARROWOOD: Your Honor, at this time, we invite Robert Suarez.

MR. SUAREZ: Judge Varlan, first, before I read my statement, I wish to thank the following: Your Honor, the court, all the court officers, coworkers, family and friends for the opportunity to express myself in this dramatic event of anger, sadness, hostility, conflict, the unknown, fear-filled emotional roller coaster; yes, even a little bit of hopelessness.

Just to give the court and Your Honor a little reference about myself, I've been in law enforcement -- I've been a law enforcement officer for nearly 30 years, and I understand as a law enforcement officer or as special agents, we place ourselves in harm's way each and every day when we report to work. We can't see the future, but we always take calculated risk in everything that we do.

I had many opportunities in my 30 years of law enforcement career. I had many different positions throughout the years; everything from a corrections

officer, canine school resource officer, drug investigator, undercover investigator, a SWAT operator, plain-clothes detective, gang and drug detective sergeant, fortunately an FBI crisis negotiator, a Spanish interpreter, a canine handler, a canine trainer, a subject matter expert on canine deployments and training, an FBI WMD assistant coordinator, even as a bomb technician support staff, a police instructor on several topics, and, of course, an FBI HIDTA Task Force officer, and now the job I love most is a member of the Joint Terrorist Task Force.

As a newly-minted law enforcement officer or special agent, there are three rules, three objectives that you learn. It is drilled into your mind because your life depends on it. Number-one objective is when you leave home is the way you want to return. Number-two objective, complacency kills. Number-three objective, don't go hungry, thirsty, sleep when you can and stay dry. Pretty simple rules for each of us in our own special meaning and reason.

Objective one is pretty simple. When you're about to leave home -- right? -- to go to work, you say good-bye; you wave to the loved ones that you hold dear in your heart. You may kiss them, hug them, your wife, your husband, your boyfriend, your girlfriend,

significant other, children, and even your pets, of course. They all expect you to return the same way you left, in one piece. You may return a little bit hungry, maybe a little tired, a little sadder, but you're always happy to see them when you get home.

Number two, complacency kills. That means remember your training, your experience, the law, policies, procedures, professional conduct. Keep in mind the job and don't be distracted.

Officers are -- must be in situationally aware mode, the ability to perceive, comprehend, anticipate situations in realtime allowing the officers or special agents to make informed decisions to respond effectively to emergencies which ultimately enhances their safety for themselves, their colleagues and the public.

And, number three, don't go hungry or thirsty, sleep when you can, stay dry basically means, eat when you can, stay hydrated, sleep when it's possible, and don't get sick. Try to maintain your overall health, which is difficult, at best, for all law enforcement.

Now, with that said, I can return to the matter at hand. Mr. Ed- -- Edward Kelley affected me and the ones I love, respect, honor and cherish. Let me count the ways. Let's start with the ones I observed and how they affected me.

My extended family, my coworkers and partners, the ones that I spend more time than anyone else, working with them, eating with them, traveling with them.

To give the Court some reference, I have no immediate family here in the great state of Tennessee. The people I work with are my extended family.

Many of them, I've heard, had some individual comments. You know, you've heard individual comments like my office wife. Well, I have office daughters, sons, nieces, nephews, brothers, sisters. I've been dubbed a name with great honor, the squad dad. So, enough said, a very special relationship I have with those who I work with.

I saw how they expressed their distress, fearfulness, anxiety, anxiousness, hypervigilance, and not knowing what the future holds. At first I felt anger and hostility towards Mr. Kelley for what he created and what he put my extended family through.

Not everyone on the list was law enforcement. They did not have the training or direct exposure to such aggression, hostility, violent threats to their life, or even manage or the sense of this violent threat. I felt sadness, fear and conflict that I could not aid, protect, or at least shield those having these

difficulties with the situation as a squad dad should, as a father should.

I felt a bit of hopelessness wash over me. I have this experience, training, stress inoculation against high-risk situations and, for the moment, I could not do anything.

Of course, I regrouped. I started thinking not about what I can't do but what I can do. I went into super-hypervigilance mode. In general, law enforcement are already in hypervigilance, but I went into the next level of hypervigilance. I was being hunted and I didn't like it. I didn't like it at all. I went back to my training, especially when my days as undercover work encountered surveillance Tradecraft. Once the situation was addressed and somewhat resolved, I still would -- I still could not start winding down or return to normal, at least I -- normal for law enforcement.

That was not the case with me. I did not return completely to normal. I do not wish to reveal too much of Tradecraft, but I -- I'll mention the one of many things that I could play defense since basically I was being hunted.

I started driving the different routes to my home, park my vehicle in different driveways and wait and see if someone was following. I would wait as much

as an hour doing surveillance. I still don't sleep through the night. I still get up in the middle of the night. My dogs -- I have four -- they are hypervigilant as well because of my random waking up in the middle of the night, and now my dogs check on me in the middle of the night, nuzzling me; why are you not awake again?

Many of my friends and family outside of Tennessee wonder if I ever sleep. I'm still working on my sleep issues, but it's getting much better now. My blood pressure went off for a while, but I have that under control now, and I am good as one can be under the circumstances.

I still have an issue with the man who served our nation, was a United States -- in the United States Marine Corps. He swore to protect the nation, the U.S. Constitution, the people of the United States. Marines have been my best canine handlers in my police canine handler courses. They are determined, strong, loyal, committed, and always faithful.

The United States Marine Corps' motto and mantra is semper fidelis, Latin for always faithful. Always faithful, represents unwavering loyalty and commitment to duty, nation and fellow Marines. All I'm left with is: What happened to you, Edward Kelley?

THE COURT: Thank you.

MR. ARROWOOD: Your Honor, finally, we invite Jessi Mann to read her statement.

SPECIAL AGENT MANN: Judge Varlan, I joined the Federal Bureau of Investigation almost 12 years ago as an intern before becoming a chemist within the Bureau's forensic laboratory.

In 2020, I went to the academy to be a special agent and was assigned here in Knoxville, Tennessee. I vividly remember making the decision to leave the comfort of my lab job to become a special agent.

I had recently finished the training program to be an explosives chemist and found myself quietly thinking, is this it; is this all I'll contribute? I had a gut feeling that I was supposed to do more, that I could give more.

The FBI director was coming to give a speech at the historic 16th Street Baptist Church in Birmingham, Alabama. I found myself sitting on a pew near where such a violent, hateful act occurred, an act that killed four children. I walked out of that church knowing I was going to be -- going to apply to be a special agent. I was filled with purpose. I wanted to help victims get answers for their families and bring criminals to justice for their actions. I had no idea that in doing the job my soul led me to do, I would become one of the

people I wanted to help, a victim.

In the hiring process and throughout the five-month-long academy to become a special agent, you are confronted with the possibility of dying in the line of duty numerous times and in a variety of ways.

The first week we received a case study that ended with us touching the tactical vest Special Agent Sam Hicks was wearing when he died while executing a warrant. At our first firearms session, we held what was left of a firearm that had been recovered from the debris in the wake of 9/11. You do not graduate from the academy and enter the field as a special agent without being prepared to give your life for this job, for this country.

While preparing to write this statement, I read each entry on the FBI's Wall of Honor, a memorial to remember employees who have fallen in the line of duty since our organization was founded in 1908. As of writing this, there were 100 fallen coworkers on the wall. These FBI employees died by gunfire while serving warrants or searching for fugitives. They have died as a result of health complications linked to 9/11. They were lost tragically in car accidents, plane crashes and in training accidents.

In two separate incidents, four special agents

total died in an office space when a lone gunman entered and began firing. There is not a single entry on the Wall of Honor where an FBI employee was hunted down and murdered by the subject of an investigation for being the case agent, much less for simply assisting on a case.

In December of '22, my squad and I learned that Mr. Kelley created a hit list containing most of our names. My mindset immediately entered work mode and stayed that way for months. There was no room for the emotion you heard at trial. There was a task at hand, a case to be worked, victims to get answers for.

Victim. I refused to accept being labeled a victim at that time. I cringed internally when anyone said it to me. I was an agent there to work. I did not like feeling weak or in need of saving, feelings one might incorrectly assume when they hear the word "victim."

I did not accept that I was a victim for a long time. I had to learn that victims do not choose to be victims. It is a result of something that happens to us.

Mr. Kelley happened to us. FBI Knoxville began working this case around lunchtime on Tuesday, December 13th, 2022. We worked nearly around the clock until the

arrest and search operations were complete for Mr. Kelley and Mr. Carter near midnight on Thursday, December 15th.

When I read the list for the first time, my heart sank. The FBI is a family in Knoxville and is no different. We are regular people who have Christmas parties as a team, go to birthday lunches together and attend each other's weddings.

From the top of the list down, I read Bob, John, Hanna, Susan, Jeff, more and more names of the people I work with day in and day out who were now at risk because the subject of my case wanted to murder them.

Over half of the FBI employees on Mr. Kelley's hit list were not special agents but professional staff; meaning they do not carry firearms or receive tactical training. Now those professional staff who helped on my case were being targeted. My life changed in that moment, but it took a while to realize the full extent of that change.

Once I heard Mr. Roddy's interview and Mr. Kelley's quote suggesting the group start the assassination issues with Agent Mann, I called my dad. I did not want my family to be surprised if something happened to me. I could not bring myself to call my

mom. Before I went to the academy, she asked me not to go. She wanted me to keep working in the lab instead. After spending 30 years worrying about her husband's safety while he worked in law enforcement, she was not sure that she could do it again with her daughter. In the observation room, I couldn't bear to tell her. Calling my dad allowed me to stay my work mindset and block the emotion for the time being.

That first night of the investigation, I slept on a cot at the office on and off for about three hours. A constant stream of questions needed to be answered and being at the office allowed me to access our case file system to get answers out as quickly as possible.

By Wednesday night, we had reached a point in the investigation where I was able to leave for several hours to sleep. My best friend, who is professional staff, is on Mr. Kelley's hit list. She asked me to bring my gear and weapons to her house and sleep in her front room because she was worried. I said yes without hesitation. When my squad found out I planned to go to my own home first to get fresh clothes, they argued over who was going with me in case of a threat or attack. Bob won that fight and came to my house. He kept watch until I had a bag packed and was driving to my friend's house. I slept in her front room with my Glock 19 on

the nightstand and my rifle on the floor next to me.

The next night, Thursday, December 15th, Mr. Kelley and Mr. Carter were in custody. By the time I went to sleep in that same front room in the early hours of Friday, December 16th, I could not shake the thought of what if there is a fourth person involved; what if they started as directed by Mr. Kelley. My Glock and rifle were still next to me just in case. I later learned that this was a thought shared by many, if not most, on Mr. Kelley's hit list.

The first weekend after the arrest, I could not stop thinking about how Mr. Roddy saved lives. If he had not courageously come forward, someone would have died.

I went to my parents' home for Christmas the next week, but my mindset was still in work mode. I had not taken the time to confront the true seriousness of the hit list, the possibility of being assassinated or losing someone in my work family.

I was physically exhausted but mentally wired, constantly ready to do the next interview or answer questions. I could not slow down. I did not realize how affected or on edge I was until my sister said something so many of us have uttered in jest; snitches get stitches. She had seen it on TV recently and was

quoting it. The second time she yelled it, I yelled, "Snitches save lives." I can count on one hand the number of times I've raised my voice to my family as an adult. I was beginning to understand I was not okay.

My mom traveled back to Knoxville with me after Christmas to stay for one night on her way to see other relatives. I didn't sleep the entire night. I couldn't shake the thought that if someone broke in my front door to kill me, the guest room would likely be the first room they found while clearing the residence using the CQB tactics Mr. Kelley and Mr. Carter practiced.

In the days that followed, I brainstormed what I could do to prevent being attacked. I analyzed my life through the scope of a murderer. How would I kill me if I were them? What are my weaknesses they could exploit?

It is rather sobering to realize no one can hide from a sniper rifle. Accepting that there is not a solution to this problem, I spent hundreds of dollars on a security system that would at least call 9-1-1 and record my murder so that my coworkers would have somewhere to start if it happened.

As victims ask me for updates on the case, I realize I had been secluded from most of them the week of the arrests due to the constant work. I had no idea

the extent of their fear for themselves and their families or how they responded.

A couple of months after the arrests, a friend on Mr. Kelley's hit list announced that she was going to have a baby in July. I instantly understood she was pregnant in December. If she had been murdered, her baby would have been as well. I was gutted. I went home and laid on the floor in my bedroom and cried for almost an hour. It was like all of the adrenalin in my body wore off in that moment. That was the first time I had let myself feel any type of true emotion towards this situation.

My mindset finally switched off work mode after nearly three months. I continue to learn the other victim's stories. A victim from the surveillance team drove home the moment he heard about Mr. Kelley's list to keep watch over his newborn baby and wife. Another victim moved his entire family into a hotel room because he feared for their lives. A single mom on the list still sees changes in her teenage son two years later.

With every story I heard, I understood more and more what it meant to be a victim. I began having sleep issues about three months in. While awake, my brain was fine. I continued working, hanging out with friends and seeing my family. At that point we knew Mr. Kelley and

Mr. Carter were detained and no one else in the conspiracy was out there.

While sleeping, my brain had a completely different reaction. I could not sleep longer than three to four hours a night. I had nightmares that thankfully I did not usually remember upon waking. I knew the dreams were violent and often resulted in me or my people dying, but I did not remember the specifics. I would wake up by jumping out of the bed with my heart racing often believing someone was in my home.

To put this in perspective, it has been over two-and-a-half years since the arrests. If I were to conservatively say I had nightmares half of the nights since, that would be hundreds of nights with nightmares, hundreds of times I have dreamed of myself and my work family dying.

Around six months in, I woke from one of these nightmares and didn't remember the last five years of my life. I thought I was still a chemist living in another state while working at the lab. I did not know whose house I was in, but I knew it was not the apartment I lived in before the academy. I didn't know whose guns and badge were on the nightstand. I began to think I had been kidnapped before seeing a T-shirt from years prior and it all came back to me.

Almost a year after the arrests, Mr. Carter pled guilty and had a proffer interview. I sat directly across from Mr. Carter, locked eyes with him and asked if they would have killed someone on Mr. Kelley's hit list. He said, yes, that within three to four more days, someone on that list would have died. Mr. Carter proceeded to list several ways he would have carried out the killing. Mr. Carter thought maybe they would have killed someone lower on the list to be less suspicious and draw the others to a funeral where a second attack would occur.

We took this threat against our lives seriously from the moment Mr. Roddy brought the list forward, but to hear Mr. Carter say we were days away from someone being murdered hit me more deeply than anything else had at that point. I could not stop thinking about all the people lower on the list who might have died because they were connected to my case on Mr. Kelley.

In March of 2024, my squad was invited to a wedding of one of our own and we had a blast. Families were invited; kids, spouses and significant others were all there. This was not the first time I had seen so many of my squad mates and their amazing families, but it was the first time since Mr. Carter's proffer.

Shortly after getting in the truck with my

friends to drive back to Knoxville, I was overwhelmed and crushed at the thought of my case being the reason Rich's, Tom's or Caleb's wives or children were murdered in their homes. I sobbed as I finally accepted that I was a victim. A part of me broke in that truck that I still have not gotten back.

For all of the preparation the FBI does to make the special agent understand we might die in the line of duty, no one ever mentioned the possibility that this job could result in your case being the reason your squad mates and their families are assassinated in their homes, are shot walking into the grocery store, or are hunted down inside a movie theater.

I asked my family if they had anything to add to this statement since Mr. Kelley's hit list changed their lives as well. From my dad: "When Jessi called me and told me about the threat on her life, my first thought was that I needed to get to her as quickly as possible. I was pleased to hear that she was being taken care of. So then my fatherly emotions started to kick in. I got mad, worried, of course. I have never worried about her not being able to take care of herself physically, but I could tell that emotionally she could use some help. I guess I needed it, also. I know that this has been very hard on her emotionally and

physically. I hope and pray that these two men get the total amount of time allowed by law in prison. This will give Jessi some peace, I believe."

From my sister: "When my dad told me about the situation, I was incredibly mad and there were a lot of tears. I was angry that someone threatened my baby sister and scared because I was not sure how it would end. I was afraid Jessi would be hurt before the men were arrested. I was trying not to freak out. It was very tense while waiting and not being able to talk to Jessi while she was at work. I believe the men responsible for the hit list should serve a life term for every life they wanted to take."

From my mom: "The world seemed to stand still around me when I found out that my daughter was placed on an assassination list. The thought of it was like a nightmare unfolding in front of me. Fear paralyzed my heart. I wondered if Jessi would be found by the men who wanted to harm her, her friends and her coworkers. I kept telling myself that no news was good news. That was how I survived being married to a police officer that served for over 30 years. I could hardly concentrate at work or sleep at night. The thought of anything happening to Jessi anguished my soul. I prayed for safety and protection. It was such a relief to know

that this man had been caught and incarcerated.  Facing the reality that someone would make plans to harm someone is petrifying, especially when that someone is your child."

As you can see from these statements and others submitted to the court, Mr. Kelley's hit list reached far beyond the 36 people listed.  Family, friends and other coworkers were all at risk and affected by Mr. Kelley's actions.

I was in the field as a special agent for five weeks when Mr. Kelley's name landed on my desk.  In the four-and-a-half years since, many things have happened that I've never dreamed of occurring in my career.

Since December 13th, 2022, I have felt an enormous weight of responsibility for my cases on Mr. Kelley and the safety of all those on Mr. Kelley's hit list.

With that being said, I fully understand that we are here today solely because of Mr. Kelley and Mr. Carter's actions.  I became a special agent to bring criminals to justice.  I believe Mr. Kelley is the embodiment of that criminal.

Mr. Kelley has shown through his willingness to assault law enforcement, followed by his willingness to lead a conspiracy to murder law enforcement, that

Mr. Kelley is a predator. Mr. Kelley considers his wants, wishes and desires to be above the law. He is a disillusioned extremist that takes it upon himself to fix the world no matter the cost, even if that cost is murder.

Mr. Kelley has not shown an ounce of remorse or willingness to admit he was wrong. I believe whenever Mr. Kelley is no longer in custody, he will take whatever actions he deems necessary to get what he wants for himself and for his view of how the world should be.

Mr. Kelley's hit list contained 36 names of local, state and federal law enforcement employees who have dedicated their lives to public service and protecting their communities. By raising their hand to serve, those 36 people ended up on Mr. Kelley's hit list and at the mercy of Mr. Kelley and his hunting party.

This case has opened my eyes to aspects of this job I never imagined. I will keep fighting for victims even when I am one. Criminals, predators and other men like Mr. Kelley will not stand in the way of justice.

I ask you, Judge Varlan, to sentence Mr. Kelley to the fullest extent the law allows because Mr. Kelley's actions warrant said sentence. Thank you.

THE COURT: Thank you.

Mr. Arrowood.

MR. ARROWOOD: Your Honor, I'd simply like to note for the record that in the courtroom today are 13 individuals who are identified on Mr. Kelley's kill list; otherwise, the Government's Trial Exhibit No. 2 and 2-R, Your Honor. That's all.

THE COURT: Thank you. And thanks to those who offered in writing, and/or today, victim impact statements for the Court's consideration in this case.

We'll now turn to the Revised Presentence Report and the objections filed by the defendant.

Mr. Brown.

MR. BROWN: Yes, Your Honor.

THE COURT: Again, the Court has reviewed all the filings. The Court appreciates those. And I think the focus here today is particularly on those that --

MR. BROWN: Yes, Your Honor.

THE COURT: -- led to enhancements and perhaps also the -- while it did not lead to an enhancement, I know there has been an objection raised to the information in the Revised Presentence Report related to the child pornography possession and the recommended supervised release conditions.

MR. BROWN: Yeah, correct. Yes, Your Honor, and I'll get to the point. I don't want to belabor time. I think I've covered everything in our written

filings.

Regarding the objections one, six through 12 and 14 through 15, I'm going to simply withdraw those at this point, Your Honor, because I can communicate directly with the Bureau of Prisons about background information and those do not affect the sentencing guidelines at all. And I'm referring to the addendum, the second addendum to the Presentence Report, Doc 135, if that helps.

THE COURT: So, let's make it clear. The objection -- you're withdrawing objection one, which relates to the background and factual information.

MR. BROWN: Correct. Yes, Your Honor.

THE COURT: All right.

MR. BROWN: Yeah.

THE COURT: And which other ones are being --

MR. BROWN: It's all underneath one category here, objections numbers one, six through 12, 14 and 15 on page 1.

THE COURT: Okay.

MR. BROWN: And probation can correct me if I'm wrong about that, but I think that's where we are. So --

THE COURT: All right. We'll consider those withdrawn.

MR. BROWN: Okay. Some of them don't matter. Paragraphs nine and 12 -- through 12 don't matter. That's about IA drills. That's -- I think the Court's best approach on that one, along with paragraph ten, is just simply to say it's moot because it doesn't affect the sentencing guidelines at all.

So, when you do these things as counsel in this position, you sort of put it all out there at the beginning and then you narrow it down as you go along. Because there is not a second opportunity to do this, you have to kind of put all your objections out at once.

Paragraph 19 was changed and paragraph 79 was changed in response to our objections, and, so, I think those are -- those are resolved. I think there is another one, too, that was also resolved, and that was objection number 23. I believe that one was resolved as well, I think. I'm getting confused here on my notes.

But as far as the other ones are concerned, objection number five regarding the gifting of the firearms. Objections 16, 17 and 18, that's the material that we thought was irrelevant.

Now, I will say here, Your Honor, I do acknowledge the statute does allow the Court to consider whatever it wants to consider. I will acknowledge that. But I thought that that particular information was too

inflammatory and too irrelevant for this particular case. There may be a case about that going forward. I don't know. That's not something I know. But I thought it was irrelevant.

The six-point enhancement, objection 19, I will still stand on the fact that -- and, look, I want to say this upfront: You don't check your humanity when you get this job. I don't doubt any of these statements and any of the impact that any of these -- the FBI agents have had, and I'm -- my heart goes out to them for having to deal with some of this, with dealing with this. I mean, like I said, you don't become less human just because they ask you to do a job, and I recognize that.

But what I will say about that is: I will still stand beside what I said in the -- in the written filings. There was still no specific threat to any specific individual. There was a list, I give you that, but it was to the FBI as a whole.

The 12- -- objection 20 and 24, which is the 12-point enhancement for the terrorism, and I don't dispute -- again, as I said in the written filings, that this is one of the enumerated filings under the statute. The question there was intent, and I think there is not a -- there was no real plan here. These people are just

talking. And I understand that talking had an impact on the FBI, and I understand that totally and appreciate and understand that, but there was no intent to do anything here other than it was just a bunch of talk. That's all it went. It didn't go any further than that.

With respect to objection number 21, the 20 -- the two point leadership enhancement, I would say on that one, again, I've covered that in the written filings. I would just ask the Court to -- to make a ruling on that, as well as the other ones.

And I don't show on my notes that there is any other ones. I think objection 23, if I can look here real quickly --

THE COURT: We have the six-level enhancement for --

MR. BROWN: Oh, yes.

THE COURT: -- I guess, the making of the threat, the --

MR. BROWN: Yes, yes.

THE COURT: -- intent to carry out the threat.

MR. BROWN: You're right, Your Honor. I apologize. That's objection 22.

I think the argument here for the United States is the list, distributing a list, recruiting accomplices, arranging weapons, things of that nature.

Let's understand at the time that Mr. Kelley obtained bomb-making components, he was not a convicted felon. So, he could obtain all that that he wanted to.

And, you know, train for close-quarter combat, I think, is another one of their issues. Well, I just don't know how you would get to the FBI building here to even do that, and you certainly can't do it with three people. And, actually, it would up being two because the third one, you know, went the other way.

So -- but I think what I -- I've submitted just about everything, and I didn't want to be repetitive, but I did want to point out the highlights. I've submitted just about everything in our written filings, and I think the Court can, you know, rule on those things. And it's basically just about preserving the record.

THE COURT: That's fine. Thank you.

Mr. Arrowood, do you want to respond to any of the specific objections made?

MR. ARROWOOD: Yes, Your Honor. Just briefly. I know the Court has said that it read all of our filings. We think we've addressed in our filings all of these particular objections.

But, just quickly, Your Honor, with respect to the child pornography located on the defendant's laptop,

we believe that that is reliable information. It's a component of the defendant's history and characteristics. It's relevant and reasonably related to the sentencing factors in 3553.

Government Sentencing Exhibit No. 1 details a review of the defendant's laptop performed by an experienced member of the FBI's CART testimony. It provides on its own sufficient information of the reliability of the information contained therein.

However, if the Court wishes to hear more information about the reliability of that, we have the author of that report here today who is prepared to testify, and he also has a disk that contains the images that were located on the defendant's laptop.

In sum, the defendant's possession of child pornography is relevant and reasonably related to 3553. It bears directly on his history and characteristics. It informs considerations, such as protection of the public from further crimes of the defendant, and for incapacitation and rehabilitation.

So, we believe the PSR correctly records that information. We believe that the intendant conditions of release indicated therein should be imposed by this Court, Your Honor. And, so, the Court can consider this in imposing his sentence.

With respect to the official victim enhancement, here in this particular enhancement, Your Honor, it's a six-level increase if the victim was a government officer, employee and the offense of conviction was motivated by such status. We believe the evidence in this case is replete with such indications. The defendant created and distributed a list of individuals, specific law enforcement officers, with their names, some with their cell phone numbers and some with their titles. So, we believe that that enhancement is properly recorded in the PSR and the Court should impose it.

With respect to the terrorism enhancement --

THE COURT: In regard to that, I think the argument -- Mr. Brown alluded to it here but more fully in his pleadings. The argument there is that the threats were to the government, in general, as a whole as opposed to individual victims.

MR. ARROWOOD: Yes, Your Honor. We think that that's contradicted, especially, in part, in relation to Government's Exhibit 2 that has the individuals identified and listed by name.

THE COURT: All right. Thank you.

MR. ARROWOOD: And, so, with respect to the terrorism enhancement, Your Honor, I don't think, as

Mr. Brown has indicated, there is any disagreement that an offense enumerated in 2332b(g)(5) is the offense that we're talking about, which is 18 U.S.C. § 114. The disagreement appears to be as it relates to the defendant's intent.

So, on this score, in order to meet the 3A1.4 enhancement, the intent must be with the purpose to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct. In this case, Your Honor, we believe we have both.

Mr. Carter, Mr. Roddy testified at trial that the defendant conspired to keep the victims in this case from performing their official duties. They testified that the defendant viewed them as the enemies. The defendant wanted to take out the, quote, "eyes and ears of the federal government," and he testified that the defendant was -- I'm sorry. Mr. Carter testified specifically that the defendant was ready to take out law enforcement preemptively to start a civil war.

So, on that evidence, we believe the first prong of the intent requirement is met; that the purpose of the defendant's conduct was to influence or affect the government or the conduct of government by intimidation or coercion.

But not only that, Your Honor, we have a lot of evidence in this case indicating that the defendant's intent to retaliate on the count of government conduct. Both Mr. Carter and Mr. Kelley testified that the defendant's hostility to law enforcement grew after his May 2022 arrest. Mr. Roddy testified the defendant referred specifically to FBI Special Agent Mann during the meeting at Jarvis Park in December of 2022.

As we said before, the defendant made a kill list of individuals associated with federal, state and local law enforcement. Special Agent Mann testified at trial that those names that are on that list all worked on the defendant's D.C. case and were all involved in the defendant's arrest and search of his home at that time.

Of course, Your Honor, the Court, the jury heard Government's Exhibit -- Trial Exhibit No. 9. This is a call between the defendant and Mr. Roddy where the defendant instructs Mr. Roddy that in the event of his arrest, he's to start it; you're taking out their office. All of this, Your Honor, we believe demonstrates retaliatory intent.

And, so, with that, Your Honor, we think that the requirements for 3A1.4 have been met in this case. The PSR correctly reports that and the Court should

impose that enhancement.

With respect to organizer/leader enhancement, here, the PSR correctly enhances the defendant's sentencing guidelines by two levels, given the fact that in this particular instance there were not five or more individuals involved. But, nevertheless, the defendant was an organizer, leader, manager, or supervisor in the criminal activity.

The evidence that supports that is some of the evidence we've already described, Your Honor, but it also involves the defendant calling for training events, which was supported by Government's Exhibit No. 1, the Signal chat group that Mr. Roddy testified about.

The defendant hosted CQB training at his home in November of 2022 with Mr. Carter. The defendant was making a plan to retrieve his weapons so they could be, quote, "within arm's reach," as indicated by one of the recorded telephone calls played during the course of the trial.

Again, the defendant created and distributed the list of targets. And when he distributed the targets, he identified it as their first mission. All of that conduct is consistent with that of an organizer, leader, manager, or supervisor. So, we believe that two-point enhancement should be imposed, Your Honor.

And then finally with intent to carry out the threats, this is the enhancement in 2A6.1(b)(1). Note just briefly that for that particular enhancement to apply, any conduct, any conduct evidencing the intent to carry out the threat results in an increase in six levels. And, Your Honor, we believe there is plenty of evidence in the record that the Court could look to. But, again, any conduct could suffice.

The defendant made and distributed the kill list. He directed Mr. Carter and Mr. Roddy to recruit others. He took steps to arrange a hornets' nest, and, again, in Government's Exhibit No. 9 at trial, he ordered the attacks to commence in the event of his arrest.

So, Your Honor, I think that addresses all of the outstanding objections.

THE COURT: Thank you.

Mr. Brown, anything further on the objection?

MR. BROWN: I would just like to address -- because this -- this phrase "started" has been the -- kind of the catch phrase from the trial and even today. But "started" is an if-then. If I get caught up in another D.C., then you start it. It's an if-then. It's not a direct commandment.

And the other part of that was Mr. Kelley

saying, if that happens to you guys, then I'm going to do the same. So, it's an if-then. It's not a direct command to do anything. Thank you.

THE COURT: All right. Thank you.

So, that -- what the Court would like to do is withhold ruling on the objections to the Presentence Report until we discuss the sentencing factors and defendant's motions because, again, there is some overlap in terms of the evidence that goes towards both.

So, why don't we do what we typically do at a sentencing now and turn to the government. If you'd like to address sentencing on behalf of the government, the 3553 factors, anything else as it relates to sentencing. And certainly I know some of your argument will necessarily be responsive to the variance departure request, but we'll give you the opportunity to more specifically respond after we hear from defendant's counsel.

MR. ARROWOOD: Okay. Thank you, Your Honor. Will do.

Thank you. I know a lot's been discussed already today, Your Honor. I'll try not to retread territory we've already covered. But I'll ask for the Court's indulgence as I address just a few of the factors that we think are salient for the Court's

analysis in sentencing the defendant.

The first is the nature and circumstances of the defendant's conduct. Mr. Kelley's criminal conduct is unquestionably serious. In 2022, Mr. Kelley, along with Austin Carter, devised a plan to murder federal, state and local law enforcement officials. Part of that plan, he identified specific targets to assassinate and he called for attack on the FBI office in Knoxville.

The defendant identified 36 individual federal, state and local law enforcement personnel to target for assassination. He created that list. He printed that list. He distributed that list to Austin Carter with a copy to go to Mr. Roddy. And in distributing those lists, Mr. Kelley identified that, that list, as their first mission.

The Court may recall the recorded calls that were played during the course of the trial. Those calls were only occurring over a brief 30-hour period. But in those recorded calls, the defendant talks about implementing counter-surveillance measures, establishing a course of action, kicking up training and coordinating, conducting immediate action drills, developing a scheme maneuver, creating a secure com plan and building a hornets' nest in Athens, Tennessee.

The defendant also talked about retrieving his

weapons and ammunition so he could have them, quote, "within arm's reach." And as the Court heard in Government's Exhibit No. 9, the defendant unequivocally directs the initiation of his course of action in the event of his arrest, which did occur, when he directs Christopher Roddy to start it; you're going to take out their office.

The seriousness of this offense is further highlighted by his motivations for targeting law enforcement. The proof at trial established that Kelley targeted law enforcement because of their anticipated role in the civil war that he anticipated initiating and because it was animus towards those who participated in his May 2022 search of his home and for his arrest.

The evidence here is clear, Your Honor, he targeted law enforcement on account of the performance of their official duties. And, so, with all of that, recognizing the seriousness of the defendant's conduct, the Sentencing Guidelines scores the defendant at an offense level of 55 and a criminal history category of VI.

Certainly the United States recognizes that that offense level is significant. It corresponds to a quite significant sentence as well. But I think if the Court takes a look at the different components that make

up that offense level, what you'll find is that the evidence that supports that is clear in this case and clearly applies to Mr. Kelley.

Mr. Kelley's history and characteristics also do not provide him much relief. As we've talked about before in our filings, Your Honor, in connection with the defendant's arrest on December 15th, 2022, law enforcement personnel seized and searched the defendant's laptop computer. The forensics examination of that laptop revealed that he possessed and viewed child pornography for years. The examination revealed 82 carved images consistent with six different child sex abuse material series. One of those series depicted a child both nude and clothed, and for this one particular child sex abuse material series, the defendant possessed nine images of the naked child.

While the possession of those images is serious enough, what the report also indicates is that the defendant likely viewed child pornography far more extensively. Now, on that score, the forensic examiner located 113 folders. Now, to be clear, it's not evident specifically what was contained inside some of those folders. Those images were not recovered. But the names of the folders are telling, Your Honor. For example, as we cite to one, one such folder is labeled

Nine-Year-Old Olivia Taylor.

The defendant's history and characteristics also reveal his remorselessness. And it's not just simply a lack of remorse. It's remorselessness plus. He believes his conduct was justified. He believes that not only was his conduct justified, but that it was -- that he was compelled to perform the criminal acts for which he's convicted here in this court.

In our sentencing memorandum, Your Honor, we provide the Court with details of the contents of a selection of recorded calls from the defendant after he was convicted by an East Tennessee jury. In these calls, the defendant self-identifies as a casualty. He refers to his conviction as a crime against the American people. He compares targeting of East Tennessee law enforcement for assassination with the activities of the colonists fighting the American Revolution.

And it's with that backdrop that the defendant makes a number of arguments for variances. So, turning now to those particular motions, Your Honor, I'll take up first the variance motion with respect to unwarranted sentencing disparity.

In support of that motion, the defendant cites *United States v. Wright*, a Sixth Circuit case. He cites if for the argument that a sentencing guideline sentence

in this case would create an unwarranted sentencing disparity.

We address this in our motion, Your Honor, but, just briefly, we believe that the *Wright* case is distinguishable in a number of ways, and while I suspect many cases can be distinguished on their facts, we believe the *Wright* case is distinguished in important ways that should be material to the Court's sentencing analysis. First and foremost, the defendants in *Wright*, all three of them, pled guilty and accepted responsibility. Here, Mr. Kelley has not done that.

Second, the adjusted offense level under *Wright* for the most culpable offender was 36, 19 points lower than what the defendant faces here today. And, moreover, the Court cited three different reasons for providing a variance for Mr. Wright. None of those three bases are relevant here.

But further underscoring the severity of the defendant's conduct, even if the Court were to vary downwards for Mr. Kelley, which it should not, but even if it did, at a level equivalent to what the Court did in *Wright*, Mr. Kelley would still be facing a guideline sentence of life in prison.

The defendant further asks for a variance on the basis that, at least in his telling of it, his

conduct did not result in any injury. As we stated in our sentencing memorandum, Your Honor, we believe that statement to be profoundly incorrect.

As the Court is aware, several of the law enforcement officers identified on Mr. Kelley's list have provided statements to the Court, some of which we've heard today. These statements detail the apprehension, anxiety, fear for the safety of loved ones, all caused by the defendant's actions.

Many of those victims describe not only how Mr. Kelley's actions impacted them and impacted them acutely in the moment, but also how his actions continue to impact them today and impact their families. Examples such as contemplations of their own execution in public places, reluctance to allow their children to play outside, suspicion at the sight of unknown vehicles in their neighborhoods and withdrawal from relationships with loved ones.

The injuries inflicted by this defendant are significant and they're long-lasting. His failure to recognize even here today that his actions had consequences further underscores the need for a guideline sentence in this case.

The argument that perhaps there was no physical injury also provides no relief for this defendant. As

this Court is aware, in the early morning hours on December 13th of 2022, it was Christopher Roddy who, after receiving an envelope containing the list from the defendant, decided to come forward. Later that day he met with the FBI. He told them about Mr. Kelley's plans. He provided the list, provided the USB drive that accompanied the list, and he agreed to record telephone calls going forward. Those calls, that list and that USB drive were all provided to the jury at trial in this particular case.

It's not a stretch here to say that Roddy's decision to come forward directly allowed law enforcement to disrupt Mr. Kelley's plans before anyone was injured. That's backed up by the trial testimony in this case.

As the Court heard from Mr. Carter, he was unequivocal. It was his view that had he and Mr. Kelley not been arrested, people on the defendant's list were going to be killed. And combine that testimony with Mr. Kelley's admonition in Government's Exhibit 9 to, in the event of his arrest, start it further underscores the importance of Roddy's conduct.

I mean, look at the timeline, Your Honor. On December 14th, a little after 3 o'clock, Government's Exhibit 9 is recorded, the call between the defendant

and Mr. Roddy where the defendant says, "start it." The defendant's arrested the next day in the evening on December 15th. There is no evidence of any intervening event in that time period that would detract from the reasonable inference that once Mr. Kelley's in handcuffs at his home on December 15th, he must have believed -- he must have believed that Austin Carter and Christopher Roddy were set to initiate the attack that he had ordered the day before. And it's in that context he's asking this Court for relief. He's inviting this Court to credit him for the brave and truly patriotic actions of Christopher Roddy. Your Honor, we respectfully suggest to the Court that it decline that invitation and reject that motion for variance.

The defendant also has three motions for departure. Your Honor, I can address those now or --

THE COURT: Well, let's let Mr. Brown --

MR. ARROWOOD: Okay.

THE COURT: -- bring those up first and we'll give you a chance to respond.

MR. ARROWOOD: Okay, Your Honor. Then, finally, just to hit on the 3553(a)(2) factors, a guideline sentence in this case, Your Honor, reflects the seriousness of the offense. It promotes respect for the rule of law and it provides just punishment.

Kelley was planning to murder law enforcement. He recruited others to his cause. He led organized training events. He sought access to weapons to carry out his plan and he identified the targets to assassinate. Both Carter and Roddy testified the defendant was serious.

As I mentioned before, Mr. Carter, again, was unequivocal in his testimony. It was his belief that if he had not been arrested and Mr. Kelley been arrested, individuals on that list would have been killed.

While Kelley's conduct on its own is unquestionably serious, the fact that he was targeting law enforcement on account of the performance of official duties further underscores the acute need in this case, Your Honor, for the sentence imposed to ensure respect for the rule of law.

The public servants he identified on his list were identified because of their performance of their official actions, because they were executing court-authorized searches, court-authorized arrests.

Furthermore, Your Honor, a guideline sentence in this case affords adequate deterrence and protects the public from further crimes of the defendant. The defendant's history reveals a proclivity for possessing and viewing child pornography. This aspect of the

defendant's history, as I mentioned before, informs consideration such as the need to protect the public from further crimes of the defendant as well as incapacitation and rehabilitation.

To be clear, though, Your Honor, even if the defendant did not possess child pornography on his laptop, the United States would still submit that a guideline sentence is appropriate in this case. However, he did, and, consequently, this Court can and should consider that fact in sentencing the defendant; in particular, whether to impose the PSR-recommended conditions of supervision.

As mentioned before, the defendant has demonstrated his fundamental lack of remorse, a commitment to continuing his criminal behavior if released and a profound need for deterrence.

For context, again, Your Honor, the defendant was arrested in May of 2022 on his D.C. case. He was arrested. He was released on conditions. He had not faced trial. He was not convicted. He had not been sentenced. And what did he do? He decided to try to kill those who investigated him.

Now, here, in this case, he's been arrested again. This time he was detained pending trial. A Grand Jury returned an indictment against him. He faced

trial, found guilty, and in a few moments, he'll be sentenced by this Court. And yet in the face of all of that, the defendant continues to believe in the righteousness of his cause. He continues to believe that his conduct was justified. That sentiment has not been in any way, in any way tampered by the time he spends in court -- or I'm sorry -- the time he spent in jail or the guilty verdict in this courtroom.

So, accordingly, Your Honor, to adequately deter this defendant and to protect the public, including and specifically the individuals identified on the defendant's kill list, the Court should sentence the defendant to a guidelines recommended term of life in prison.

Finally, Your Honor, just to sum up the nature and circumstances of the offense conduct, the history and characteristics of this defendant, all in the context of 3553(a) all point in the same direction, Your Honor. A guideline sentence here is warranted, and, accordingly, we ask the Court to sentence the defendant to such sentence.

THE COURT: Thank you, Mr. Arrowood.

Mr. Brown, if you'd like to address sentencing from the defendant's perspective, inclusive of your motions for departure and/or variance.

MR. BROWN: Okay. Thank you, Your Honor. There is a lot to unpack there, but let me try and get through some of it.

Some of it is what the United States has just presented to you as complete speculation. By saying that when Mr. Kelley was arrested, he must have believed that Austin Carter and Christopher Roddy were doing what he ordered is complete speculation with absolutely no basis in any evidence that was presented in this case.

I do not doubt mental injuries. I don't doubt that. I'm not disputing that. But there is a much different issue between a mental injury and a physical injury. And, in this case, there were no physical injuries. Physical injuries are blowing up a federal building in Oklahoma City and killing 161 people. That's a terrorist. Mr. Kelley is not a terrorist. There are numerous examples out there of terrorists. And to do this and just say because he gets a terrorism enhancement, he's a terrorist just doesn't add up.

In their response to our motion for a departure or variance, they said any departure or variance would counter the statutory sentencing factors in 18 U.S.C. § 3553(a). In fact, a departure and variance would -- it would comply with the sentencing factors in 3553(a) because the mandate is to treat each person as

an individual, and by taking the terrorism enhancement and a one-size-fits-all, well, you've got a terrorist enhancement, you must be a terrorist, so, you're getting the scope of what the penalties for a terrorist would be, it just doesn't make any sentence.  It takes away the absolute requirement that you consider the defendant as an individual.

Again, the list is the list.  Without anything else happening, that is just it; it's just a list.  It has a list of people.  Best of my recollection, it doesn't -- it's not entitled Assassination List.  It's not entitled Kill List.  It's just titled The List, to the best of my recollection.

There was never a plan of any type.  Three guys cannot attack an FBI building.  I'm not sure that three guys could even attack a simple convenient store.  It takes a lot more than that to attack a building, and all we have here is a bunch of talking.

They want to talk about phone calls.  Let's talk about Mr. Roddy and Mr. -- and Mr. Carter's last phone conversation which shows you this is not a plan where Mr. Carter -- Mr. Roddy says, "Are you on board with this?"  And Mr. Carter says, "Well, I am if you are."  That's not a plan.  That's just a bunch of talking.

And, in fact, in that same conversation, Mr. Carter says, "Well, I might go about it differently." And I'm paraphrasing all this, but that's the general -- the general thoughts.

In their response to our motion for departure or variance, they talk about plans to attack the FBI office in Knoxville, IEDs attached to drones on vehicles. No IEDs were ever recovered in this case. None were ever built. And there was no proof at all that any IED was ever going to be slammed into the FBI building.

Austin Carter said what he said, but is it, in fact, the truth? The truth is: They never recovered any of those things. You just can't attack the FBI building here in Knoxville. It's too well-fortified. It's got a fence around it. It's at the top of a hill. I don't know how you could even get in the thing, much less attack anybody in there.

And the concept of three people starting a civil war is just kind of absurd. There is no way three people can start a civil war. And, really, it was just down to two people because Mr. Roddy went to officers the same day that Mr. -- or the day before Mr. Kelley was arrested.

And I've touched on earlier the whole concept

of "start it." It's an if-then. If I get arrested in D.C., not here, you guys start it. It's an if-then. It doesn't add up.

As far as the departure concerns, those out of the sentencing guidelines, I mean, Mr. Kelley got one point for his criminal history category because of the Washington, D.C. case, which he was eventually pardoned from, but it still counts. It's one point. But now you're talking about, with the terrorism enhancement, throwing him up into category VI and putting him in the same category as a career offender who has got multiple drug and gun charges. It just doesn't add up.

I did mention that he was in the active duty military for eight years, deployed to Iraq and Afghanistan. I have filed under seal his discharge papers which show numerous commendations. He was helping to fight a war on terrorists and now we're going to brand him a terrorist?

And, finally, the one about the aberrant behavior, and we're getting all caught up on this child pornography thing. And I understand that it's there. I get that; okay? But is this a case about Mr. Kelley and what he did in this case, or is this a case about child porn because we're mentioning that all the time? And it seems out of place and out of line other than to

consider it maybe as part of history and characteristics to constantly harp on it that he had child pornography on his laptop. So, it is outside -- this behavior is outside of what has been an otherwise law-abiding life. Served his country, has two small children, has a family in the area. All of those things weigh in his favor.

And, again -- again, I'm going to finish on this: He is simply not a terrorist in the way that terrorism is defined. He's simply not. And that's why a departure or a variance from the sentencing guidelines, if they're calculated like probation has calculated, is warranted. If all the enhancements were taken away, he'd still be facing a level 33 and still a significant time in prison.

Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Brown.

Mr. Arrowood, would you like to respond?

MR. ARROWOOD: Thank you, Your Honor. I'll just briefly touch on the bases for departure that the defendant raises.

First, the departure based on 4A1.3. This is a departure based on inadequacy of criminal history. Here, Your Honor, the defendant argues that because he's in criminal history category VI that that is unreasonable for him given the imposition of the 3A1.4

terrorist enhancement.

Your Honor, respectfully, we oppose this departure. Excuse me. The defendant's conduct in this case fits squarely within 3A1.4. It is not a stretch to apply that particular enhancement here. It's within the heartland of 3A1.4 cases.

Both Congress and the Sentencing Commission have concluded that the defendant's crimes in this case, through the imposition of the 3A1.4 enhancement, present a particularly serious threat because, in part, due to the difficulty of deterring and rehabilitating the defendant.

And this is especially apparent here where this defendant has exhibited no remorse. Even after the jury found him guilty of the charged crimes, he continues to justify his actions. He believes he's a victim. He believes the prosecution and their verdict are unjust and he was obligated by his sense of patriotism to engage in this criminal conduct.

Your Honor, we believe that the 3A1.4 enhancement, which elevates the defendant's criminal history category to VI, is appropriate and the Court should not depart accordingly.

With respect to the defendant's military service, as we note in our sentencing memorandum,

service of any kind is certainly laudable. The defendant's service in the Marine Corps certainly is as well. It's something the Court can consider as a component of his history and characteristics, but it doesn't warrant a departure.

Here, in this particular instance, the defendant's military service is not of such an unusual degree that would result in a departure. And as I mentioned before, with respect to history and characteristics, it perhaps is enriched to the defendant's benefit. But it's a little more complicated than that.

If the Court looks to the nature and circumstances of this particular offense, in connection with the defendant's experience as an infantryman in the Marine Corps, it further underscores the severity of the crime for which he's been found guilty here in this court.

With respect to the departure pursuant to 5K2.20, aberrant behavior, to qualify for that departure, the defendant must meet three requirements. First, he must have committed a single criminal occurrence or transaction that was committed without significant planning, was of limited duration and represents a marked deviation by the defendant from an

otherwise law-abiding life. We believe the Court can adjudicate this departure without any reference at all to the defendant's possession, viewing or accessing child pornography.

The defendant's offenses in this case do not represent a single criminal occurrence or transaction. They involve a concerted effort by the defendant over several weeks to target East Tennessee law enforcement for assassination.

The defendant was involved in setting up training sessions to conduct CQB training and immediate action drills. He met in person with Carter at his own home to conduct such training. He met with Carter and Roddy in Jarvis Park in December of 2022, where he discussed conducting assassination missions, and he developed a kill list. All of that, Your Honor, for all those reasons, we don't believe an aberrant behavior departure in this case is warranted, Your Honor.

And, so, subject to any further questions or inquiry of the Court, that's all I have.

THE COURT: I don't think I have any at this point. But, thank you, Counsel, for your arguments offered in writing again and today.

Anything else from counsel as it relates to the sentencing factors or sentencing or the motions before

the Court?

Mr. Arrowood, anything further?

MR. ARROWOOD: No, Your Honor.

THE COURT: Mr. Brown, anything further?

MR. BROWN: No, Your Honor. Thank you.

THE COURT: All right. Then the next thing we would do is, we would turn to you, Mr. Kelley. You have the opportunity to say anything you'd like to say or make an allocution before sentence is imposed. If you'd like to, just remain seated and speak into the microphone.

THE DEFENDANT: Yes, Your Honor. Excuse me. I've had a bit of a sore throat. If you'll just bear with me.

One thing: I know it's not necessarily your judicial style, but I do urge you to reconsider your rejection of our Motion to Vacate Conviction based on the January 20th pardon. And I would like to cite the Court's own trial briefing that says these cases are necessarily and inexplicably intertwined. That can be found on Document 63, page 7.

Additionally, those conversations I had post-conviction referring to no remorse, that was all in reference to January 6 and my actions on January 6; conversations with Brittany Bailey, the reporter, and

Peter Doyle, a member of my former church.

So, they are using January 6 repeatedly. During trial, they used photos collected from the January 6 raid to show the firearms collection I had prior to my arrest that I gifted to Joshua Julian. He owned them. He traded them for livestock. He sold them to my father. I did not own them. I did not have access to them, Your Honor. That is in the government's own exhibits.

I urge you to reconsider your motion because this, by the Court's own words, is related directly to January 6. And it seems like the reason they want life imprisonment is to get any sort of blood they can out of people from -- that were at the Capitol on January 6.

The fact of the matter is: The January 6 prosecution and arrests was the largest criminal prosecution in American history, and Donald Trump undid all of that on January 20th. With what was revealed by William Taylor, the FBI was out for revenge against me, Your Honor, and they are out for blood. They are out for revenge in any way they can. That is my view on this, Your Honor, and I urge you to reconsider and vacate the conviction based on the January 20th pardon as it in the best interest of justice.

I look to live a life of peace and security and

safety and raise my boys and be a problem to nobody if you do reverse your decision, Your Honor. But that is up to you. Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Kelley.

I anticipate taking a break here momentarily because I want to consider everything said today within the context of the legal framework that's before the Court. But we also have -- let me just go ahead. We also have defendant's motion for release pending appeal.

Do you want to say anything further on that, Mr. Brown?

MR. BROWN: Just quickly, Your Honor. This motion is about what I would call emptying the tank, making sure that whatever I do when I walk out of here today, I've done everything I can possibly do.

But I do think it does fit the criteria. If we're worried about dangerousness -- you know, again, I don't discount mental injury. I'm not ever going to discount that. But there was no physical injury in this case, and I don't think he's a danger to -- to anybody if he's granted bail pending his appeal. And there is no real risk that he's going to flee. His father lives over in Jamestown. He's going to go live over there. He's not going to be close to Knoxville at that point. He'll be living with his father. And we can get -- this

is probably a little beyond what we're arguing here, but we can get into all kinds of conditions that would be acceptable.

But the big thing about this is: Realistically, this does -- contrary to what the United States is trying to convince you, this does raise a substantial question as to whether this case is covered because the pardon says "related to." So, it is a substantial question. And it doesn't ask you, Your Honor, to say, well, I did something wrong or I committed reversible error. That's not the standard. You don't have to do that.

All you have to look at is, is there a -- could this go either way. And let's be honest, if it goes Mr. Kelley's way, this case is over. If it goes not against -- if it goes against Mr. Kelley, then what happens is, he reports to prison.

So, there is a substantial question of law or fact involved here because of the words that I didn't use but President Trump used the words "related to," anything related to January 6th, and we're probably going to have to have the Court of Appeals and maybe even the United States Supreme Court tell us what "related to" means. But it does raise a substantial question and grounds under the statute that he could be

released pending appeal.

THE COURT: All right. Thank you.

Mr. Arrowood, do you want to respond to that or anything else you want to respond to?

MR. ARROWOOD: Thank you, Your Honor. Just briefly. We'll rely mostly on our response we filed in response to defendant's motion for release.

But with respect to the substantial question of law issue, Your Honor, this is one factor that the Court has to consider. As an initial factor, the defendant must show by clear and convincing evidence that he is not likely to pose a danger of safety to the community or to any other person. He has not done that here, Your Honor.

For all the reasons we've talked about in this courtroom, throughout the trial and at the sentencing hearing, his release would pose a significant danger not only to the community but to his individual targets that he identified in the course of the criminal conduct related to this case, Your Honor. Thank you.

THE COURT: All right. Thank you.

All right, everyone. Excuse me just a moment.

(A discussion was had off the record between the Court and the courtroom deputy.)

THE COURT: All right. Thank you again,

everyone.

The next step would be for the Court to proceed with imposition of judgment and sentence. There is a lot for the Court to sift through. We have to address the objections and then move on to the consideration of the 3553 factors, the consideration of defendant's motions and related matters. I think it would be -- this would be a natural breaking time anyway, and just to give the Court time to consider everything said and argued here today, as well as to take a final look at everything that was previously admitted, I think we're just going to take a lunch break and come back at 1:15. At that time, the Court should be prepared to proceed forward. So, we'll stand in recess until 1:15.

THE COURTROOM DEPUTY: All rise. This honorable court stands in recess until 1:15.

(A luncheon recess was taken at 11:45 a.m.)

**AFTERNOON SESSION**

(1:28 p.m.)

THE COURTROOM DEPUTY: All rise. Please come to order and be seated.

THE COURT: Thank you, everyone.

Moving forward and in a manner intended to comply with the Sixth Circuit's jurisprudence since the *Booker* case rendered the sentencing guidelines advisory

in *Gall v. United States*' requirement that the Court make an individual assessment based on the facts presented and adequately explain the chosen sentence, the Court will explain its reasons for the sentence to be imposed in this case, discussing the advisory guideline calculation and the factors discussed in 18 United States Code § 3553 relevant to this case.

Based on those factors and in consideration of the guidelines range, as well as the motions, particularly the defendant's motions before the Court, the Court will then endeavor to impose a sentence sufficient, but not greater than necessary, to comply with the purposes discussed in 18 United States Code § 3553.

We'll begin with rulings on the objections to the Presentence Report. Before I do that, obviously the defendant had objections, and I believe the record is pretty clear the government had no objections, but just to confirm that with you, Mr. Arrowood, does the government have any objections to the Presentence Report?

MR. ARROWOOD: No, Your Honor.

THE COURT: All right. Thank you.

Also, before turning to consideration of the Presentence Report objections, let me -- the Court has

acknowledged and takes into consideration the parties', via counsel's, arguments today in writing, as well as in court today. I want to particularly acknowledge counsel for the defendant, Mr. Brown, in this case, who was appointed to this case as a member of the CJA or Community Justice Act panel and has diligently represented defendant throughout this proceeding. Service on the CJA Panel is an important safeguard of the fundamental right to the assistance of counsel in a criminal case as protected by the Sixth Amendment to the United States Constitution, and the Court recognizes Mr. Brown's service on the CJA panel for many years, his work on this and other appointed cases and his service to his profession, to the Court and his country in this regard.

Turning now to the objections, defendant's -- this first objection -- and I'm going to number them, I believe, the way they're numbered in the Presentence Report and/or in the parties' filings. But the first objection we discussed relates to background information set forth in the Presentence Report based on either changes to the Presentence Report, based on the withdrawal of some of those motions today and/or based on the fact that other portions related to that particular objection, pursuant to Federal Rule of

Criminal Procedure 32, it not being necessary for the Court to make a ruling given that it will not affect the Court's sentencing determination. The Court believes objection one has been adequately addressed.

Defendant's next objection, which the Court has as its second objection, is the objection to his description of child pornography or sometimes referred to as CP discovered on defendant's personal computer or phone as contained in paragraph 24 of the Presentence Report.

Relatedly, he objects to paragraph 91 and 92 containing special conditions of supervised release for sexual offenders. Defendant argues this information is irrelevant or prejudicial given he's not been charged with or convicted of a sex offense.

The government, on the other hand, defends inclusion of this information. It filed a sealed report with the court that contains a description of the CP discovered on defendant's computer, that being Exhibit 1, which was made an exhibit to the pleading, and the Court will, just for the record, also allow it to be introduced in today's hearing under seal as Government's Exhibit 1.

The government particularly argues defendant's possession of CP relates directly to his background and

character and are properly considered by a sentencing court even when the offenses of conviction are not sex offenses.

Title 18, United States Code § 3661, a provision cited by both parties, states that, quote, "No limitations shall be placed on the information concerning the background, character and conduct of a person convicted of an offense, which is" -- "which a Court of the United States may receive and consider for purposes of imposing an appropriate sentence," close quote.

As a threshold matter, a matter of statutory law permits the Court to consider this material for the purposes of imposing an appropriate sentence and the parties do not dispute the Court's authority to do so.

Rather, the defendant appears to argue the Court should exercise its discretion to either remove this information, disregard it for sentencing purposes and/or decline to impose special conditions related to his possession of child pornography.

As background, the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit had repeatedly affirmed the principle that a sentencing court may consider prior criminal activity of a defendant, even when the defendant was never arrested,

indicted or convicted of such conduct; the Court, among other Sixth Circuit cases, looking at *United States versus Overby* and *United States v. Hill*, 2021 and 1982, respectively, decisions of the Sixth Circuit.

And in -- specifically in the context of child sex offenses, the Sixth Circuit has held that evidence that a defendant possesses or uses child pornography is, quote, "probative of defendant's history and characteristics and the need to protect the public from further crimes of the defendant," close quote, even where such evidence relates to unindicted conduct or even legal conduct; the Court looking at *United States v. Cunningham*, a 2012 decision of the Sixth Circuit.

Given all of that and considering the case law and statutory law related to this issue and looking specifically at paragraph 24 stating that defendant possessed 82 images of child pornography or a certain number of images of child pornography on his computer and the Government's Exhibit 1 further detailing the contents discovered on the defendant's computer, the Court will overrule defendant's objection with respect to paragraph 24 and notes that it may take this information into account as part of defendant's history and characteristics in fashioning an appropriate

sentence.

As to the paragraphs 91 and 92 and the special conditions contained therein, the Court has reviewed the case law in that regard cited by both parties and the Court, at this point in time, is going to sustain defendant's objection to inclusion of special conditions of supervised release related to sex offenses and will decline to impose the supervised release special conditions related to sex offenders in the Presentence Report. As such, the Court denies, in part, and sustains, in part, defendant's second objection.

Defendant's third and what the Court has labeled as the third objection relates to defendant's objection to the application of a six-level victim-related adjustment pursuant to Guideline §3A1.2(b) at paragraphs 32, 39 and 47 of the Presentence Report. Specifically, he argues he never -- that the defendant never threatened individual government officials and, instead, generally targeted the government.

The government responds by citing trial evidence that it argues substantiates application of the enhancement. Among other things, it points to defendant's statements regarding FBI Agent -- Special Agent Jessi Mann whose name was among those contained on

the list that defendant distributed to Carter and Roddy.

Additionally, the government contends that defendant's crimes were directed at numerous other individual law enforcement officers from the FBI, Tennessee Bureau of Investigation and other agencies and departments.

With respect to this enhancement, Guideline §3A1.2 provides for a three-level enhancement where the victim was -- again, paraphrasing or quoting -- "...the victim was a government officer or employee, former government officer or employee or a member of the immediate family of a person described in subdivisions A and B and the offense of conviction was motivated by such status."

Application Note 1 to this section clarifies that -- again, quoting or paraphrasing -- "This guideline applies when specified individuals are victim of the offense and does not apply when the only victim is" -- "when the only victim is an organization, agency or the government."

Additionally, if subsections A1 and 2 apply and the applicable Chapter 2 guideline derives from Chapter 2, part A, §3A1.2, then the enhancement provides for a six-level enhancement, which is the enhancement that has been applied here.

Taking these provisions in turn, the Court first finds that defendant's victims included, quote, "government officers or employees," close quote.

In its memorandum of opinion and order denying defendant's Motion for a Judgment of Acquittal or New Trial entered on March 10, 2025, as Document 101, which is hereby incorporated by reference, the Court recounted trial evidence concerning the recipients of defendant's threats.

Specifically, the Court noted that the list -- that the list that has been discussed extensively and during the course of trial included those names of those individuals who had been involved in investigating defendant's prior conduct on January 6, 2021, and that he specifically identified and listed numerous individuals who would qualify as government officers or employees for purposes of this sentencing enhancement.

This observation extends to all three counts, and, therefore, the three paragraphs to which defendant now objects in conspiring to murder employees of the United States, Count One, soliciting others to commit a crime of violence, Count Two, and threatening to murder federal law enforcement officers, Count Three, defendant targeted, the Court finds, individual government officer

victims.

Additionally, the evidence of the list of names prepared by defendant substantiates the next requirement of Guideline §3A1.2(a); that is, but for the victim's affiliation and involvement in their respective law enforcement agencies, they would not have been listed and identified as potential targets. So, the Court would find under the enhancement the offense of conviction was motivated by their status as law enforcement officers or employees.

And then finally, the parties do not appear to dispute that the base offense level provisions for all three counts arise from Chapter 2, part A, thereby triggering the six-level enhancement rather than the three-level enhancement.

In sum, the Court finds the defendant's victims were official victims within the meaning of Guideline §3A1.2 and this third objection is overruled.

Next, the defendant's fourth objection relates to application of the 12-level terrorism enhancement pursuant to Guideline §3A1.4(a) at paragraphs 33, 40 and 48. Specifically, he argues this provision is intended for more extreme acts where a preponderance of the evidence demonstrates that the defendant's specific intent to retaliate against the government.

The government defends application of this enhancement because defendant's offenses of conviction are among those enumerated within the provision's statutory scheme; additionally contends that trial testimony from Carter and Roddy established defendant's specific intent to retaliate against the government. The government also notes defendant's assertion that he lacked a plan to harm law enforcement officers is foreclosed by the jury verdict.

Here, Guideline §3A1.4 provides for a 12-level enhancement where, quote, "The offense is a felony that involved or was intended to promote a federal crime of terrorism," close quote.

Additionally, the provision automatically increases a criminal history category to Category VI. Application Note 1 to this provision states that, quote, "For purposes of this guideline, federal crime of terrorism has the meaning given that term in 18 United States Code § 2332b(g)(5)," close quote. And that statutory provision, by extension, defines "federal crime of terrorism" as an offense that is, quote, "calculated to influence or effect the conduct of government by intimidation or coercion or to retaliate against government conduct," close quote, and arises under specifically-enumerated federal statutes. And I'm

going to spend a little more time on this enhancement because it was the subject not only today but of some of the more extensive filings in this case.

The Sixth Circuit has clarified the application of each of the two prongs established under this statute. First, *United States v. Graham*, a 2001 Sixth Circuit case, the Court held that the defendant -- quoting, "The defendant need not have been convicted of a federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)(5) for the district court to find that he intended his substance offense of conviction or his relative conduct to promote such a terrorism crime," close quote.

The *Graham* court further ruled that a sentencing court must, quote, "identify which enumerated federal crime of terrorism the defendant intended to promote satisfied the elements of that statute and support its conclusion by a preponderance of the evidence in facts from the record," close quote.

Second, the Sixth Circuit has interpreted -- and this is the *United States v. Wright* case cited by the government -- that the phrase calculated to influence or affect prong, to require specific intent, that is, quoting from *Wright*, "A defendant has the requisite intent if he or she acted with the purpose of

influencing or affecting government conduct and planned his or her objectives with this" -- "and planned his or her actions with this objective in mind."

And the Court also noted in *Wright* that specific intent, quote, "may be found even if the record does not contain direct evidence of the defendant's particular frame of mind," citing as examples cases in which the Court's inferred intent from defendants who, quote, "sought to bomb or otherwise violently target government facilities," close quote.

So, the Court begins with that background in mind with the more straightforward question: Are the defendant's offenses of conviction specifically enumerated under 18 United States Code § 2332b(g)(5), or, as discussed in *Graham,* sufficiently intended to promote such a terrorism crime?

Counts One and Two, as undisputed, arise from violations of a specifically-enumerated offense under Section 2332b(g)(5).

Count Three, on the other hand, alleging a violation of 18 United States Code § 115, is not among those enumerated offenses listed. However, based on the record as a whole in this case and considering the trial evidence and the exhibits otherwise introduced, the Court would find, by a preponderance of the evidence,

that the conduct underlying this count is sufficiently related to warrant further consideration of the enhancement to Count Three, provided the evidence supports the elements of § 2332b(g)(5)(A).

So, in a manner intended to comply with *Graham*, the Court has determined that all three counts of conviction relate to the enumerated federal crime of terrorism of 18 United States Code § 1114.

Now the Court turns to the issue of whether preponderance of the evidence shows that defendant possessed a specific intent to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct.

Again, defendant argues, quoting from his sentencing memorandum, "There was no plan and, importantly, no intent to actually retaliate or influence the FBI in any manner." The government again cites Carter and Roddy's trial testimony that defendant viewed the government as enemies against whom he wished to retaliate and that the trial evidence revealed that the defendant sought to identify precisely those officers who participated in his arrest and the search of his house in May of 2022.

The government also discusses the list that has been discussed already by the Court, and using that

direct link standing alone is enough to establish the defendant's retaliatory intentions.

Turning to the Court's prior Memorandum Opinion and Order, again, Document 101, the Court previously noted that the trial evidence, quote, "confirmed the defendant developed this scheme, in part, due to his distrust of the government and his desire to participate in a new civil war," close quote. Moreover, quote, "Unrebutted trial testimony from multiple FBI personnel described defendant's acquisition and storage of significant quantities of firearms, ammunition, explosives, and guides for creating homemade bombs," close quote, which were intended for an eminent attack against the Knoxville FBI Field Office.

Indeed, at trial, Roddy testified that the defendant's phrase, quote, "racked, locked up and loaded," close quote, meant that he should be prepared in case he was needed to attack the FBI Field Office.

Based on the totality of the evidence before the Court and as discussed in the Court's prior Memorandum and Opinion, as just gone through with the court, the Court does find that the defendant, quote, "acted with the purpose of influencing or affecting government conduct and planned his actions with this objective in mind," close quote; again, looking back at

*United States v. Wright.*

The Court also notes that the Sixth Circuit has reaffirmed and applied *Wright* in a case similar to this one, *United States versus Stafford*, a Sixth Circuit 2015 case. The Court held that Guideline §3A1.4 was appropriately applied to one of Defendant Wright's co-defendants convicted of conspiring to bomb a bridge, in part, because he, quote, "targeted a government infrastructure," close quote.

The Court noted defendant's choice of target, quote, "when great harm to innocent individuals is contemplated is at least some evidence of intent to affect government conduct," close quote.

In another opinion addressing §3A1.4, *United States v. Dye*, a 2013 Sixth Circuit case, the Sixth Circuit upheld a district court's inference that the defendant's targeting of a court was intended to affect court operations even where the defendant never stated his intent.

And, in this case, the Court would determine that the retaliatory mode of influence appears as strong or stronger than in *Stafford* or *Wright* because the evidence supports a finding that the defendant's plan, list and preparation were all motivated by law enforcement officials investigating him, and his

targeting of individuals stationed at the Knoxville FBI Field Office makes clear, even more so than the targeting of a bridge, that he sought to interfere with or affect the government's conduct.

And the Court does not find availing defendant's attempt to distinguish this case from *Wright* when comparing the planning of explosives to, quote, "merely," close quote, creating a list or kill list. In fact, the evidence the Court finds rebuts defendant's contention that he was merely, quote, "talking," close quote, and never formed sufficiently-concrete plans to harm individuals.

The Court would also note in its -- would also note that unlike the defendant in *Wright*, the defendant here appears to have expressed no remorse for his conduct, and the defendants in, I believe, both *Wright* and *Stafford* faced lower adjusted offense levels than this defendant.

And, then, finally, the Court also looks at an unreported opinion of the Sixth Circuit, *United States v. Doggart*, D-o-g-g-a-r-t, a 2021 Sixth Circuit case, in which the Sixth Circuit described similar arguments to which defendant made here as, quote, "faint comfort," close quote, upholding a district court's conclusion that the defendant posed a danger to the

public based on his obtaining maps and discussing weapons.

So, in sum, the Court has carefully considered the legal standards underlying Guideline §3A1.4 and the evidence presented in this case and finds that the application of this enhancement is appropriate and will overrule defendant's fourth objection.

Turning next to the defendant's fifth objection, the defendant objects to the application of a two-level leadership enhancement pursuant to Sentencing Guideline §3B1.1(c) at paragraphs 34, 41 and 49 of the Presentence Report.

Specifically, he argues the only stated basis for applying this enhancement is his preparation and distribution of the list of targets, and he also argues that such matters as calling for training events and other actions do not rise to the level of leadership. The government, in turn, defends application of this enhancement based on trial evidence concerning defendant's organizing or training, close quarters, combat exercises, preparation of the list of individuals involved in the investigation of the defendant, among other things.

Additionally, the government cites in this regard defendant's statement to Carter and Roddy to,

quote, "start it," close quote, indicating that he was leading the conspiracy. And the Court recognizes defendant's arguments as to the conditional nature of the "start it" language, but it's -- the Court would find this language still speaks towards actions defendant wanted Carter and Roddy to take, specifically to exact revenge for the investigation of him by law enforcement.

Specifically, Guideline §3B1.1 provides for a two-level enhancement where the defendant was an organizer, leader, manager, or supervisor of -- in any criminal activity and the activity involved fewer than five participants.

Application Note 4 to this section cited by both parties provides, quote, "The Court should consider the exercise of decisionmaking authority, the nature or participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Again, the Court has related the evidence in this case and it also looks at additional evidence, such as the defendant's creation of an encrypted Signal chat

where he organized the training exercises and drills and the later distribution of a list of victims to Carter and Roddy. The defendant, the Court would find, based on the evidence in this case, did exercise decisionmaking authority both in preparing himself and his co-conspirators for an attack and in developing the nature and targets of the attack itself.

And as significantly, the targeted victims at the heart of this conspiracy were identified due to their involvement in investigating the defendant, and neither Carter, nor Roddy, actually appeared to have been connected to the individuals otherwise on defendant's list. In other words, the fruits of the crime would have related to defendant's retaliatory objectives, not those of his conspirators, and, accordingly, the Court will overrule defendant's fifth objection.

Defendant's sixth objection relates to the six-level enhancement applied to Count Three pursuant to Sentencing Guideline §2A6.1(b)(1) in paragraph 45 of the Presentence Report. Specifically, the defendant argues, among other things, he did not have weapons available to carry out the offense he threatened to commit because they were, quote, "gifted," close quote, to his friend.

The government defends application of this

enhancement based upon evidence that the defendant took concrete steps in furtherance of his threatened conduct, pointing to, among other things, Special Agent Smith's testimony regarding bomb-making components and firearms, among other examples, from trial.

Here, Guideline §2A6.1(b)(1) provides for a six-level enhancement where the offense involved any conduct involving -- or excuse me -- evidencing an intent to carry out such threat.

And Application Note 1 to this section provides the Court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense. However, conduct that occurred prior to the offense must be substantially and directly connected with the offense under the facts of the case taken as a whole.

Here, the Court finds that the trial record contains numerous examples of defendant's intent to carry out his threats against federal officials. The defendant followed through with verbal threats by preparing for an attack, including the acquisition of firearms and homemade explosive materials and his preparation and distribution of the aforementioned list.

Even if the Court were to accept defendant's argument regarding the availability of firearms, other

evidence in this case similarly supports this enhancement. For example, in connection -- or, for example, we have the verbal commands to Carter and Roddy which the Court has already discussed, and these statements, taken together with the facts of the case as a whole, further evidence defendant's intent to carry out his threats and follow through with the planned attack. Therefore, defendant's sixth objection is overruled.

Defendant's seventh objection relates to an objection to probation's description of his convictions in the Washington, D.C. case at paragraph 62. The government doesn't oppose this objection and concurs with the objection related to how that was stated, and, actually, the probation officer amended this paragraph to correct her response to this objection. So, this objection the Court would deny as moot, basically.

Defendant's eighth and ninth objections relate to his submission that the total offense level and criminal history category indicated in the Presentence Report are incorrect. That's based on the objections to the enhancements he's applied. Based upon the Court's rulings today, the Court finds the offense level and criminal history category are accurately stated in the Presentence Report, and, therefore, overrules

defendant's eighth and ninth objections.

The tenth objection, the defendant objects to the requirement that he participate in a program addressing domestic violence, anger management and general violence while on supervised release as set forth in paragraph 95(b). He argues he has no history of violence and this case involves inchoate crimes that do not have in it violence.

The government argues defendant's engagement in a conspiracy to murder law enforcement is an inherently violent crime and further contends the evidence at trial demonstrates defendant's inclination towards violence.

Although defendant notes he's being convicted of inchoate crimes, a conspiracy to murder is an inherently-violent offense. Here, the defendant's acquisition of weapons and instructions to Roddy on December 14, 2022, to, quote, "take them out at their office," close quote, manifest an inclination towards violence.

As stated in paragraph 95(b), this special condition is, quote, "aimed at reducing the risk of recidivism and providing for public safety," close quote. So, the Court will not delete the special provision, but does note, to the extent the defendant argues he does not present a history of domestic

violence, the Court believes it appropriate to amend the special condition such that he participate in a general violence program, but will sustain, in part, the objection to the extent he requests the term "domestic violence" be removed.

Finally, the defendant objects to the Presentence Report statement regarding grounds for departure or variance at paragraphs 104 and 105. This objection is overruled insofar as nothing contained in these paragraphs is construed to present or disfavor the Court's consideration of defendant's motions for downward departure or variance.

So, having ruled on the objections to the Presentence Report, the Court does find that the advisory guideline range in paragraph 83 has been appropriately calculated. Based on a total offense level of 43 and criminal history category of VI, the guideline imprisonment range is life.

Turning now to the § 3553 factors, beginning with the nature and circumstances of the offense. Again, defendant has -- or was found guilty after a jury trial to Count One, conspiracy to murder an employee or employees of the U.S., solicitation to commit a crime of violence, and -- that being Count Two, and Count Three, threat to assault and murder and to retaliate against

federal law enforcement officers.

With respect to the nature and circumstances of the offense, the Court has reviewed and will incorporate as part of its analysis of the nature and circumstances the offense conduct as set forth paragraph 7 through 24 of the Presentence Report, as well as certainly all of the trial testimony and evidence from the trial in this case which occurred on November 18 through 20, 2024, and the additional evidence offered today and the entire record in this case. That is inclusive of, of course, the testimony of Christopher Roddy at trial, the testimony of co-defendant Austin Carter at trial, the summary of the phone calls between Roddy, Carter and defendant, the testimony of FBI Agent Smith and Special Agent Mann, and as well as the defense witness, FBI Special Agent Feaster.

Again, the Court is not going to reiterate in detail the offense conduct in this case. It's been discussed today. It's been discussed in the pleadings. It's set forth in the Presentence Report. And, of course, the Court presided over the trial in which all the evidence of the offense conduct was introduced.

But, briefly summarized and as summarized in the government's sentencing memorandum, defendant did -- or was found guilty of devising a plot to target

specific individuals for assassination or attack, as well as planning an attack on the FBI office in Knoxville following execution of a search warrant.

Again, the trial evidence included defendant's discussions with Carter about using improvised explosives and drones and targeting of specific individuals.

Further, the evidence included training drills, distribution of weapons and/or assigning of roles and missions. Of course, included the list that has been the subject of much discussion today and in the trial, containing names of individuals who participated in defendant's court-authorized search and arrest. All of that the Court takes into consideration and considers as part of the nature and circumstances of the offense conduct in this case.

With respect to the history and characteristics of the defendant, per his sentencing memorandum, he reports a somewhat difficult childhood with his father's frequent absence. He reports three siblings with some estrangements or distancings. The defendant was married but reports his wife filed for divorce in 2023 while he was incarcerated for these offenses. The defendant has two minor children, two sons, and he himself is now currently 36 years of age.

The Presentence Report recounts his criminal history, which the Court takes into consideration as well. Also looking at the Presentence Report, with respect to the defendant's physical condition, he is not prescribed any medications but states he's been declared ten percent disabled by Veterans' Affairs for hearing loss while serving in the military.

The defendant reports no history of mental health diagnoses or illnesses, nor reported use of illegal substances. He received a high-school diploma in 2007, and is skilled as an infantry rifleman and trained in heavy equipment operations. The defendant was unemployed or became unemployed at the time of his arrest. Paragraph 79 of the Presentence Report recounts his prior employment in, among other places, Johnson City, Morristown and Knoxville.

The Presentence Report and the sealed exhibit provided by defendant discusses his military service with the United States Marine Corps from 2007 to 2015. He obtained the rank of sergeant with various unit decorations and good conduct awards and reports deployment in Iraq, Afghanistan, Southeastern Asia, and Japan and an honorable discharge from the Marine Corps.

So, with this background in mind, having recounted the nature and considered the nature and

circumstances of the offense and the history and characteristics of the defendant, the Court turns to the need for the sentence imposed to reflect various factors as are set forth in 18 United States Code § 3553, the first of which has been and as has been discussed today is the seriousness of the offense conduct. Defendant continues to underscore that, quote, "No one suffered any injury," close quote, as a result of his, quote, "discussions," close quote.

The government, on the other hand, notes the concrete steps defendant took to execute his plans and the list that he developed containing names of individuals contained -- connected to defendant's prior arrest.

At bottom, the convictions here, again, for conspiracy to murder employees, Count One, solicitation to commit a crime of violence, Count Two, and threatening to murder federal law enforcement officers, Count Three, and the offense conduct associated thereto, do, the Court finds, constitute extremely serious conduct, again, as demonstrated by the facts, the record and the jury verdict in this case.

The seriousness of the offense conduct is also demonstrated by the victim impact testimony and statements offered in person today and/or submitted to

the Court. They were extensive, and by way of brief summary, show, among other things, defendant's actions caused many victims to suffer anxiety and paranoia about the possibility of being assassinated during their daily activities. Some victims state that these effects have persisted to the present, including lasting effect on their family members as well.

As discussed in the statements, the effects included anxiety, apprehension, sadness, fear, conflict, and feelings of hopelessness. Several victims indicated that the defendant's actions stand alone in terms of their gravity and impact among cases that their -- that these officers have worked.

Several victims noted the unarmed person- -- support personnel who lacked the personal defense training and situational awareness to respond once they learned of the risk against their personal safety, and victims also expressed concern that defendant would continue to carry out violence if and when he is released given his continued lack of remorse.

All of this the Court finds reflects on what the Court has determined to be the seriousness of the defendant's offense conduct and the need for the sentence imposed to reflect the seriousness of the offense.

Next, the Court considers the need to promote respect for the law and provide just punishment. Again, the Court considers the level, scope and breadth of defendant's offense conduct and the seriousness of that conduct. The Court also considers defendant's previous criminal history and/or the relative lack thereof, but also considers that criminal history within the context of the enhancements found applicable here, including, but not limited to, the terrorism, leadership and victim enhancements.

Here, the Court would determine that the need to promote respect for the law particularly stands out. The government describes the defendant as, quote, "remorseless," close quote, and nothing the defendant has done or not done since the trial of this action has offered challenges to this description.

Even given the opportunity today after hearing the victim impact statements and the parties' arguments, defendant declined to express any remorse, regard or regret for his independent actions in the Eastern District of Tennessee that occurred well after the conduct in his D.C. case. All of this, the Court finds, gives rise to a need to promote respect for the law and provide just punishment.

Next, the Court is to consider the need to

afford adequate deterrence. There are two aspects to deterrence. One is general deterrence; that is, fashioning a sentence that might act as a general deterrent to others similarly situated to this defendant who might contemplate the undertaking of similar crimes in the future.

The second aspect of deterrence is specific deterrence; that is, a sentence that would specifically deter this defendant from future crimes in light of his offense conduct and convictions here.

Defendant argues he has led an otherwise law-abiding life and also notes that his case has been well-documented by the media and that his sentence will be broadcast to others considering this type of conduct, thereby lessening the Court's consideration of the deterrence factor.

The government, on the other hand, submits a, quote, "profound need," close quote, for deterrence in this case. It cites defendant's serious offense conduct and his lack of remorse. It also counters defendant's description of a law-abiding life, not only with his offense conduct here, but also with the uncovered possession by defendant of child pornography and specifically the sealed forensic examination report that outlines multiple folders containing child pornography.

The Court pauses to note that it would reach the same sentencing result in this case today regardless of any consideration of defendant's child pornography possession information. But the Court, at the same time, notes some aspects of similarity with the offense conduct here, in terms of secretiveness, shielding of information and efforts to hide potentially incriminating information.

Given that and, again, given the serious nature of the crimes here and given consideration of the defendant's remorsefulness or lack thereof, the Court does find a need for the sentence to address both general and specific deterrence.

Next, the Court considers the need to protect the public from further crimes of the defendant. For all the same facts and reasons discussed, the Court similarly finds a significant need for the sentence imposed to protect the public from further crimes of this defendant.

Again, the Court does note and takes into consideration and will discuss further momentarily defendant's arguments concerning his criminal history and his offense conduct, but it also considers the serious nature of his actions and offense conduct, the totality of the evidence supporting his convictions, as

well as his lack of remorse in this case all lead to the conclusion that there is a need to protect the public from further crimes of the defendant.

Another consideration is to provide the defendant with training, education and medical treatment. Given defendant's history and characteristics, the Court would not find a particular need to provide the defendant with training or educational opportunities. Although, the Court would note their availability and potential development during any period of incarceration.

The Court also notes defendant's apparent lack of substance abuse or mental health history, but also notes its earlier discussion concerning the need for programs addressing anger management or general violence, and in discussing and recommending any such treatment, the Court is not intending to and is not imposing or lengthening defendant's sentence to enable him to complete a treatment program or otherwise promote rehabilitation.

So, having gone through the factors of 18 U.S.C. § 3553, the Court will now move to defendant's motions for downward departure and/or variance. At the outset, the Court finds it appropriate to distinguish a departure from a variance as the defendant's motion

makes a request for both.

A departure refers to the imposition of a sentence outside of an advisory guidelines range due to the application of a particular guidelines provision; whereas, a variance refers to the selection of a sentence outside the guidelines range based upon the Court's weighing of one or more the sentencing factors of § 3553(a).

The Court recognizes its discretion to depart or vary as it deems appropriate. And the Court also notes that certain guidelines provisions can aid the Court in determining whether to vary from an advisory guideline range.

Looking first at defendant's downward departure request, defendant moves for a downward departure pursuant to Guideline §5K2.20 which provides the Court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or a single criminal transaction that was committed without significant planning, was of limited duration and represents a marked deviation by the defendant from an otherwise law-abiding life.

However, this section further states that a Court may not depart downward -- may not depart downward where, among other things, quoting, "the offense

involved serious bodily injury or death or whether the defendant has a prior federal or state felony conviction or any other significant prior criminal behavior, regardless of whether the conviction or significant prior criminal behavior is accountable under Chapter 4."

Application Note 2 to this section further clarifies that, quote, "planned behavior does not meet the requirements of subsection (b)," close quote.

The government opposes this ground for departure arguing the defendant's crimes were the result of significant planning over several months. The government further contends this offense conduct does not constitute a deviation from an otherwise law-abiding life based upon his possession of child pornography, among other things.

In any event, even if the Court were not to -- again, were not to consider the child pornography possession, the Court finds the defendant is ineligible for an additional departure based on §5K2.20 for multiple reasons. Among other things, his offense conduct could be seen as involving serious bodily injury or death insofar as he conspired to murder or assassinate federal officials. And, further, the evidence in this case demonstrated defendant's significant planning over multiple days and months,

which is not, the Court finds, the type of aberrant behavior envisioned by this guideline section. Accordingly, the downward departure request pursuant to §5K2.20 is denied.

Defendant also moves for a downward departure pursuant to Guideline §5H1.11, which provides that, quote, "Military service may be relevant in determining whether a departure is warranted if the military service individually or in combination with other offender characteristics is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines," close quote.

In support, the defendant cites his honorable discharge from the United States Marine Corps, and in a sealed filing with the Court, he substantiates his service record.

The government argues defendant's military service, while laudable -- quote, "laudable," close quote -- fails to rise to the level warranting a departure.

The Court notes during his service as a rifleman, he was deployed by -- deployed to Iraq and Afghanistan earning, among other honors, the Combat Action Ribbon, Navy Unit Commendation and Global War on Terrorism Expedition Medal.

The Court certainly recognizes the defendant's years of active duty military service and his meritorious service in the Marine Corps, but ultimately finds the defendant's military service does not distinguish this case from the typical cases covered by the guidelines, even taking into consideration his military service.

And the Court would also note -- make two notes in that regard additionally. One, it's worth noting from the victim impact letter submitted and read into court today, one of the conclusions of that letter -- I'll quote from it -- quote, "I still have an issue with a man who served our nation and was in the U.S. Marine Corps. He swore to protect the nation, U.S. Constitution and people of the United States," close quote.

Also, the Court would note that the defendant, in fact, while he has what the government deemed laudable military service, in fact, his offense conduct in this case involved utilization of aspects of that military training and expertise in planning this offense, recruiting others, conducting drills, and potentially carrying out violent acts. So, for all these reasons, the Court would overrule or deny the motion for downward departure pursuant to this

provision.

And then finally, defendant moves for a departure pursuant to Guideline §4A1.3 which provides for a departure where a defendant's stated criminal history, quote, "substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."

Defendant argues that in the absence of the terrorism enhancement discussed earlier, the Presentence Report notes only one criminal history point for a conviction that has since been pardoned. He submits no reasonable basis for treating him the same as an offender, quote, "who has more than 13 criminal history points or a career offender with numerous drug crimes and crimes of violence in his background," close quote.

Responding in opposition, the government emphasizes, again, the defendant's lack of remorse and recent statements justifying his actions and contends that the defendant falls squarely within the ambit of this criminal history enhancement designed by Congress and the Sentencing Commission for the particular threats posed by terrorism.

Although the Court has not been made aware of a Sixth Circuit opinion directly addressing this issue, a case from the Second Circuit lends some credence to the

basis for defendant's argument.  In *United States v. Stewart*, a 2009 Second Circuit case, the appellate court upheld a district court's determination that the terrorism enhancement applied, but that its automatic criminal history category increase overstated the defendant's criminal history and, therefore, found a downward departure under §4A1.3 was warranted.  Whereas here, the defendant would have otherwise received a criminal history category of I, not VI.

However, as one judge, Judge Walker, noted in his partial concurrent to *Stewart*, whatever the merits of adjusting the criminal history component of the terrorism enhancement, quote, "a district court's complete elimination of the effect of the enhancements vertical component in assessing the seriousness of defendant's crime cannot withstand the scrutiny in light of the district court's obligation to impose a sufficient" -- "to impose sentence sufficient to reflect the seriousness of the crime of conviction," close quote.

The Court also in its research has noted a recent United States District Court's case for the Middle District of Tennessee in which the district judge did vary downward where the §3A1.4 enhancement applied and placed defendant with zero criminal history points

into a criminal category of VI. That case was *United States v. Giampietro*, G-i-a-m-p-i-e-t-r-o.

However, unlike the defendants in *Stewart* and *Giampietro*, this defendant presently before the Court does not stand to benefit from a criminal history reduction because his offense level well exceeds the maximum allowable level of 43. In other words, defendant's actual combined offense level is 55, but under the guidelines is capped at 43. And even without a 12-level terrorism enhancement, defendant would still be above the cap offense level of 43.

There are further distinctions between this case and the Middle District of Tennessee and Second Circuit case which the Court reviewed. The defendants in those appeals had offense levels that were much lower than this defendant's; in fact, were below the cap level of 43. So, while the Court looks to those cases for guidance, the Court finds distinguishing factors between those cases and this case.

Further, again, as the Court has noted, the sentencing table this Court has before it here does provide for a guideline sentence of life imprisonment at an offense level 43 regardless of a defendant's criminal history category; again, be it category I, II, III, IV, V, or VI.

So, whether the Court were to grant or deny this basis for downward departure makes no difference. At least with respect to defendant's calculated advisory guideline range. In other words, even if the Court did not apply the terrorism enhancement, given the offense level here and the other enhancements applied, even looking at a criminal history category of I, the defendant's advisory guideline range still is life.

And, moreover, in any event, the Court determines that the criminal history category enhancement contained within the terrorism enhancement is part of the statutory scheme envisioned by Congress such that this Court cannot conclude that it substantially overrepresents the seriousness of defendant's criminal history, and the Court is, therefore, going to deny the defendant's third basis for a downward departure.

Turning next to the defendant's variance request. In contrast to a downward departure, a variance from an applicable guidelines range is most appropriate when the particular circumstances of the case fall outside of what's termed the heartland of similar cases before the Court in light of the sentencing goals contained in § 3553(a).

Defendant advances several arguments that his

case falls outside the heartland of similar cases. He points, among other things, to the fact that no victims suffered physical harm in this case. He points to his home life and family circumstances. He points to his absence of previous criminal history, and he points to the need to avoid significant sentencing disparities in this case pointing to the information contained in what, I believe, is paragraph 107 of the report, the Judiciary Sentencing Information, or JISN information related to similarly-situated defendants.

The government counters these assertions for many of the reasons we've seen discussed today. Among other things, it notes a counter to defendant's claim of causing no harm. The victims in this case, as was evidenced by the victim impact statements, have, in fact, experienced long-lasting anxiety and fear for the safety of themselves, family members and others.

It also argues that but for Roddy's decision to alert law enforcement of defendant's threatened attack, physical injury was highly likely. And it further argues that the need to avoid sentencing disparities is not favored departing from a guideline sentence in this case because, according to the government, the defendant falls squarely within the class of offenders and offense conduct contemplated by the guidelines range.

With reference to the Sixth Circuit's *Wright* case, the government further argues none of the factors favoring a variance in this case are present here. Namely, defendant possessed weapons capable of causing real damage. It does not appear he was directed or coerced to participate in this scheme by anyone else, and he does not report childhood circumstances influencing his decision to undertake the offense conduct here.

Here, the Court incorporates its earlier analysis of the § 3553(a) factors in total as to the nature and circumstances of defendant's offense conduct, his history and characteristics and the need for the sentence imposed to reflect various factors. The Court takes that analysis and applies it with equal force in discussing and analyzing defendant's requests for a variance in this case, and ultimately the Court finds that the defendant's arguments regarding the circumstances of this case, taken individually or together, do not take this case outside the heartland of similar cases.

Specifically, while defendant, again, contends no physical harm occurred here, that's belied by the victim impact statements first and foremost and also belied by the real possibility of violent actions and

resulting harm as contemplated by the defendant.

The Court would find his home life and family circumstances first are taken into consideration, but are not so unique as to take this case outside the heartland of similar cases. And the Court has already discussed his criminal history and does not believe that it gives rise to a variance, particularly given his offense level cap of 43, regardless of if he is viewed with a criminal history VI or criminal history I category.

And then finally turning to defendant's disparity argument and, more specifically, as referenced to the United States Sentencing Commission's Judiciary Sentencing Information contained in paragraph 107, first let the Court update that information. The JISN has actually been updated to reflect fiscal year 2024.

During the time since the probation officer disclosed the Revised Presentence Investigation Report, according to the most recent data, based on five defendants whose primary guideline was §2A1.5 versus the four defendants in paragraph 117 of the Presentence Report, the average length of imprisonment decreased slightly from 357 to 347 months, but the median length increased actually from 336 months to 456 months.

Second, and as is made clear in paragraph 117

from the United States Sentencing Commission, quote, "This sentencing data provided does not reflect the Commission's recommendation regarding the appropriate sentence to be imposed or represent the officials" -- "represent the Commission's official position on any issue or case, nor does the information provided reflect the Commission's position regarding the weight to be given, if any, to the above sentencing information and, of course, determination of the appropriate sentence to be imposed," close quote.

Paragraph 117 continues from the Sentencing Commission, quote, "If the Court does consider the above sentencing information as part of the factors in 18 United States Code § 3553(a) in imposing a sentence, it should do so only after considering the properly calculated guideline range and the applicable departures provided for in the Guidelines Manual," close quote.

So, even if the Court does take into consideration the JSIN, the Court here would find no disparity and certainly no unwarranted disparity because if we return to the § 3553 factors, § 3553(a)(6) requires that in determining a particular sentence to be imposed, the Court is to consider the need to avoid unwarranted disparities. And the Sixth Circuit has emphasized in *United States v. Phinazee*, among other

cases, that it is unwarranted disparities in sentences to be avoided, not those that are warranted.

And more to the point, even in considering the JSIN, but also considering, as the Sentencing Commission tells us to and as the case law tells us to, considering the applicable guidelines range and the § 3553(a) factors, the Court finds that neither this statistical information, nor the factual circumstances cited by the defendant take this case outside the heartland of similar cases. So, again, the Court will deny the defendant's request for a variance in this case.

So, that takes us back to everything considered, including the guidelines range and the relevant § 3553 factors, as well as certainly the arguments made by both parties, and while the Court has denied the downward departure and variance requests, the Court does take into consideration all the facts cited in support of those motions.

But particularly the Court returns to the need for the sentence imposed to reflect various factors, and the Court would find this case does, as the Court has already stated but would reemphasize, find a high need in this case for the sentence imposed to address almost all the factors of § 3553. Sometimes cases address some of those factors more than others, but other than,

perhaps, providing the defendant with training, education and to a lesser extent medical treatment, the Court returns to its conclusions of a significant and high need for the sentence imposed in this case to reflect the seriousness of the offense conduct, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant.

And in light of all of that and based on the discussion here today, the Court will, in fact, impose a guideline sentence in this case of life. For all the reasons discussed, the Court finds this sentence to be sufficient, but not greater than necessary, to comply with the purposes of 18 United States Code § 3553.

The Court will further impose a supervised release term of five years with all the standard conditions, as well as the special conditions of supervision in paragraph 95 of the Presentence Report; namely, submission to searches upon reasonable suspicion of a violation of the conditions of supervision and, as modified, participation in a program addressing anger management or general violence. The Court finding these special conditions to be reasonably related to the several sentencing factors discussed by the Court to involve no greater deprivation of liberty than

reasonably necessary for those several sentencing purposes and to be consistent with pertinent policy statements issued by the Sentencing Commission.

Specifically, and, again, incorporating its 3553(a) analysis, the Court finds these special conditions to be reasonably related to the history and characteristics of the defendant, the underlying offense conduct and the need for the sentence imposed to, among other things, provide deterrence, protect the public, and to reflect the seriousness of the offense conduct.

Accordingly and pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court as to Counts One, Two and Three of the Indictment that the defendant is committed to the custody of the Bureau of Prisons for a term of imprisonment of life as to Count One, 240 months as to Count Two and 120 months as to Count Three to be served concurrently for a net term of life.

Upon release from imprisonment, you shall be placed on supervised release for a term of five years as to Count One, three years as to Count Two and three years as to Count Three to be served concurrently for a net term of five years.

While on supervised release, you shall not commit another federal, state or local crime. You must

not unlawfully possess and must refrain from use of controlled substances. You must comply with the standard conditions adopted by this court in Local Rule 83.10. In particular, you must not own, possess or have access to a firearm, ammunition, destructive device, or dangerous weapon.

You shall cooperate in the collection of DNA as directed by the probation officer and again comply with the special conditions of supervised release as outlined and adopted by the court.

Title 18, U.S.C. §§ 3565(b) and 3583(g) require mandatory revocation of supervised release for possession of a controlled substance, ammunition or firearm or for refusal to comply with drug testing.

Pursuant to Title 18, U.S.C. § 3013, you shall pay a special assessment fee in the amount of $300 which shall be due immediately. The Court finds you do not have the ability to pay a fine and will waive the fine in this case.

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, the Court advises you may have the right to appeal the sentence imposed in this case. A Notice of Appeal must be filed within 14 days of entry of judgement. If you request and so desire, the Clerk of Court can prepare and file the Notice of Appeal for

you.

All right.  That leaves the Court finally to consideration of defendant's motion for release from custody pending appeal.  Defendant argues he meets the criteria for release and that he does not pose a danger if released and his appeal presents a substantial and novel legal question.

The government opposes this motion arguing the evidence in this case demonstrates defendant poses a danger to the safety of others and further contends there is no substantial question of law or fact that calls in doubt the result of defendant's trial.

18 United States Code § 3143(b) provides a defendant may be released pending appeal where the Court finds, again, quoting or paraphrasing from 3143(b), "where the Court finds by clear and convincing evidence the person is not likely to flee or pose a danger to the safety of any other person or the community if released and that the appeal is not for the purposes of delay and raises a substantial question of law or fact likely to result in reversal, an order for a new trial or a sentence that does not include a term of imprisonment or a reduced sentence to a term" -- "or a reduced sentence to a term of imprisonment less than the total of the time already served, plus the expected duration of the

appeal process."

The Court here finds defendant does not satisfy the criteria set forth in § 3143. First, as discussed throughout today's hearing and in the record before the Court, the defendant's offenses of conviction did involve violent threats against members of the community that appear to have been motivated, in whole or in part, by their role as law enforcement officers, and based upon all of this evidence, the Court cannot find by clear and convincing evidence, certainly, that the defendant poses no danger to the safety of any other person or the community. In fact, the Court has found otherwise in several respects and based upon its 3553(a) analysis in this case, which the Court would incorporate here as well.

And even if the Court reached the second step, the Court does not find that the issues identified in defendant's appeal are likely to result in reversal or any other outcomes described in § 3143(b)(1)(B). Since the Court entered its Memorandum and Opinion Order, Document 102, in this case, defendant -- denying defendant's motion to dismiss on March 10, 2025, in fact other district and appellate courts have concurred with respect to the scope of the presidential pardon which the defendant referenced in his allocution.

Specifically, the government cites a recent D.C. Circuit Court of Appeals Opinion denying release pending an appeal based upon the same executive order, that being *United States v. Wilson*, a 2025 D.C. Circuit case.

The Court also -- this Court also notes in another case considering the applicability of the January 6 pardon, quoting from an opinion in that case, quote -- and referencing this case, quote, "Subsequent to this Court's decision in Kelley, other courts have agreed that the plain meaning of the pardon's text limits its scope to offense occurring on a particular date and a particular location."

So, while defendant in his motion may be correct that this case perhaps presents some novel legal issues, the release pending appeal statute demands more, in fact, much more; that is, release is only appropriate where a substantial question of law or fact likely will result in reversal or a new trial.

Here, the Court cannot find such an outcome to be likely and, accordingly, the defendant's motion for release pending appeal is denied. And it's further ordered that the defendant be remanded to the custody of the Attorney General pending designation by the Bureau of Prisons.

Mr. Arrowood, does the government have any

objection to the sentence just pronounced that has not previously been raised?

MR. ARROWOOD: No, Your Honor.

THE COURT: Mr. Brown, does the defendant have any objection to the sentence just pronounced that has not previously been raised?

MR. BROWN: I think all our objections are preserved, but I will just go ahead and, for the record, put the procedural and substantive objections on the record. Thank you.

THE COURT: Thank you. Anything further on defendant's behalf, Mr. Brown?

MR. BROWN: No, Your Honor. Thank you.

THE COURT: Anything further from the government at this time?

MR. ARROWOOD: No, Your Honor.

THE COURT: All right. If not, I thank everyone for their participation both this morning and this afternoon.

We'll stand adjourned.

THE COURTROOM DEPUTY: All rise. This honorable court stands adjourned.

(Which were all the proceedings had and herein transcribed.)

* * * * * *

C-E-R-T-I-F-I-C-A-T-E

STATE OF TENNESSEE

COUNTY OF KNOX

I, Teresa S. Grandchamp, RMR, CRR, do hereby certify that I reported in machine shorthand the above proceedings; that the foregoing pages were transcribed under my personal supervision and constitute a true and accurate record of the proceedings.

I further certify that I am not an attorney or counsel of any of the parties, nor an employee or relative of any attorney or counsel connected with the action, nor financially interested in the action.

Transcript completed and signed on Friday, August 22, 2025.

---

TERESA S. GRANDCHAMP, RMR, CRR
Official Court Reporter